## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

MICHAEL R. ESCUE
2330 St. Joseph Road
Birmingham, Alabama 35243

        Plaintiff,

        v.

SEQUENT, INC.
c/o Statutory Agent, Osac Inc.,
100 S. Third Street
Columbus, OH 43215,

        and

WILLIAM F. HUTTER
6830 MacNeil Drive
Dublin, Ohio 43017,

        and

MICHAEL L. SCHOONOVER
740 Retreat Lane
Powell, OH 43065,

        and

JOHN E. BOYER
240 Glen Village Court
Powell, OH 43065,

        and

GLENN J. GETTMAN
452 Delegate Drive
Columbus, OH 43235,

        and

Case No. **2:09 cv 765**

Judge **JUDGE GRAHAM**

Magistrate Judge _____

**MAGISTRATE JUDGE ABEL**

FILED
JAMES BONINI
CLERK

09 SEP -2 PM 12: 39

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

STEVEN R. KERBER                          :
5612 Riverside Drive                      :
Dublin, OH 43017,                         :
                                          :
            and                           :
                                          :
THOMAS A. EWERS                           :
499 Thrush Rill Court                     :
Powell, OH 43065.                         :
                                          :
            Defendants.                   :

## COMPLAINT

Plaintiff Michael R. Escue ("Escue" or "Plaintiff"), for his complaint against Defendants

Sequent, Inc. ("Sequent"), William F. Hutter ("Hutter"), Michael L. Schoonover

("Schoonover"), John E. Boyer ("Boyer"), Glen J. Gettman ("Gettman"), Steven R. Kerber

("Kerber") and Thomas A. Ewers ("Ewers") (collectively "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.      This action seeks rescission of a merger procured by fraud and breach of contract,

recovery of damages sustained by reason of such fraud, breach of contract and violation of

Federal securities laws, and recovery of damages related to claims under the Ohio Statutory

False Claims Act and for breach of fiduciary duty.

2.      Escue was the sole shareholder of Better Business Solutions of Alabama, Inc.

("BBSA"). BBSA was a professional employee organization ("PEO") located in Birmingham,

Alabama. BBSA provided human resource services to business clients located principally in and

around the Birmingham, Alabama area.

3.      Sequent, located in Ohio, was at all relevant times, and currently is, a PEO.

Sequent's majority shareholder and Chief Executive Officer ("CEO") was at all relevant times,

and currently is, Hutter. The other individual defendants are, and at all relevant times were, directors of Sequent.

4.     PEO's provide services for their own corporate employees ("Corporate Employees"), as well as to clients and their leased employees ("Jobsite Employees")

5.     Effective January 1, 2007, Sequent acquired BBSA through a merger transaction in which Escue exchanged his BBSA shares, which were valued for purposes of the merger by an outside consultant at $1,871,630, for shares in Sequent (the "Merger").

6.     In order to procure the Merger, Sequent and its Directors concealed from Escue that: Sequent had engaged in certain unlawful transactions, described *infra*; Sequent was then operating its business in contravention of law, described *infra*; and that Sequent and/or one or more of its officers were the subject of a then ongoing and still pending criminal investigation by the United States Department of Labor ("DOL"). Defendants also concealed and/or omitted to disclose, and had a duty to disclose to Escue, that they had each participated in, directed and/or approved actions that included income from illegal loans, income from illegal administrative fees, income from illegally inflated insurance premiums, and illegal business practices, including "tiering" of charges rendered to Sequent clients and inflating rates charged to hundreds of Sequent clients ("Jobsite Employers"), and thousands of employees including Jobsite Employees leased by Sequent to Jobsite Employers and Sequent's own Corporate Employees, for health, dental and vision insurance coverages, as well as insurance coverages under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").

7.     Defendants' unlawful actions inflated the value of Sequent and Defendants further misrepresented the value of Sequent by failing to properly reflect liabilities for violations of the

3

Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and other criminal and civil law violations, described *infra*.

8.    Escue seeks rescission of the December 20, 2006 Merger Agreement and related agreements, and an order appointing a receiver for Sequent with direction to place Sequent's assets acquired from BBSA into a separate entity and thereafter to transfer ownership of the entity to Escue in exchange for Escue's Sequent shares received as consideration for the merger. In addition, Escue seeks damages from Defendants, jointly and severally, to compensate for harm caused, as well as reasonable attorney fees by contract and fraud.

## THE PARTIES

9.    Plaintiff Escue is an individual who is and at all relevant time was a resident of Alabama. Plaintiff Escue has served as President of the Leadership Council for the Mid-South Region of the National Association of Professional Employer Organizations, which is the largest trade association for PEOs nationwide. Escue also serves on the Governmental Affairs Committee and is well regarded in the industry.

10.    Until January 1, 2007, Escue was the sole shareholder of BBSA. Effective on that date, Escue exchanged all of his BBSA shares for shares in Sequent, and, in connection with the Merger, became a director of Sequent.

11.    Defendant Sequent is a privately and closely held corporation organized and existing under the laws of Ohio, with its principal place of business at 4700 Lakehurst Court, Dublin, Franklin County, Ohio. In addition to Escue, the individual defendants are Sequent's only shareholders.

12.    Sequent Retirement & Benefits Group ("SRBG") is an Ohio limited liability company with its principal place of business at 4700 Lakehurst Court, Dublin, Franklin County, Ohio. The shareholders of SRBG are the individual defendants.

13.    Accompany Benefits, LLC ("ABL") is an Ohio limited liability company with its principal place of business at 4700 Lakehurst Court, Dublin, Franklin County, Ohio. ABL is also currently registered to, or the trade name of SRBG. For purposes of this Complaint, ABL effectively refers both to ABL and SRBG as they function one in the same.

14.    Defendant Hutter is an individual who is and was at all relevant times a resident of Ohio and the CEO and the majority shareholder of Sequent. Hutter was also at all relevant times, a shareholder and director of both Sequent and ABL.

15.    Schoonover, Boyer, Gettman, Kerber and Ewers are each individuals who were at all relevant times, residents of Ohio and, along with Hutter, served both as shareholders and directors of Sequent, and as to ABL as well (collectively referred to herein as the "Interested Shareholders/Directors"). At all relevant times, in addition to acting as shareholders in Sequent, Schoonover served and continues to serve as its Chairman of the Board of Directors; Kerber served and continues to serve as its Corporate Secretary, and Boyer served and continues to serve as its Treasurer.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a), as this action is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. This Court also has subject matter jurisdiction over this action pursuant to U.S.C. § 1331, as claims arise under § 10(b) of

5

the Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), and Rule 10b-5 promulgated by the SEC

hereunder at 17 C.F.R. § 240.10b-5.

17.    Venue is proper in this district pursuant to 28 U.S.C. §1391(a) because Sequent,

SRBG, ABL, Hutter, Schoonover, Boyer, Gettman, Kerber and Ewers reside in this district.

Venue is additionally proper in this district pursuant to § 27 of the Exchange Act, as Defendants

conduct business in and at some of the wrongful conduct took place in this district, and

Sequent's principal executive offices are in Dublin, Ohio, where the day-to-day operations of

Sequent are directed and managed.  In addition, with respect to contract claims tied to the

merger, §11.08 of the Merger Agreement provides that any dispute arising out of the Merger

Agreement shall be subject to "the exclusive jurisdiction of the appropriate court in Franklin

County, Ohio."

## FACTUAL ALLEGATIONS

### A. Professional Employer Organizations and Laws Applicable Thereto

18.    BBSA was, and Sequent is now, a PEO.  PEOs provide services to employers

which allow employers to outsource employment related functions such as the operation of a

human resource department, audit, payroll, tax management, employee benefits &

administration, employee handbook development, employment and labor law compliance,

workers' compensation claims and risk management.  With respect to many of those services,

PEOs are regulated by ERISA, and subject to the DOL's regulatory jurisdiction.

19.    Sequent, at all relevant times, sponsors and administers the Sequent, Inc.

Flexible Benefits Plan (the "Plan") and the Sequent Welfare Benefits Trust ("TRUST").  The

Plan was created by Sequent and intended to be an employee benefit plan providing group

health, dental and vision benefits.  Sequent treats the Plan as a single employer plan subject to

6

ERISA. The TRUST was created by Sequent to hold Plan assets and act as a receiver for premium payments for the Plan's medical, dental and vision benefits, and cafeteria plan reimbursement accounts from Jobsite Employers and/or Jobsite Employees, and from Sequent's own Corporate Employees, and to pay those premiums to insurers. ERISA regulates the use and operation of such trusts.

20.     ABL was formed by Hutter and the Interested Shareholders/Directors of Sequent as an entity to offer services in the areas of employee benefits design, life, health and disability insurance, and retirement and non-qualified deferred compensation plans. ABL provided consulting services to Sequent, the Plan and to the TRUST, which included services for Sequent's clients. Prior to the Sequent-BBSA merger and thereafter, the shareholders and directors of ABL were also shareholders and directors of Sequent.

**B. Illegal Loans Related to Sequent Pre-Merger**

21.     Prior to the Merger, Hutter and the Interested Shareholders/Directors approved a plan for Sequent to make loans to Hutter and the Interested Shareholders/Directors in a total amount of at least $347,918. Hutter was loaned $97,000, which he used to buy a Porsche automobile. Each of the Interested Shareholder/Directors also received loans, which varied in amount based on each shareholder's overall percentage of shares held of Sequent. Because of these loans, Sequent's financial condition did not meet accounting standards required by the Employer Services Assurance Corporation ("ESAC"). ESAC is an entity that provides accreditation and client assurance programs for the PEO industry's increased acceptance and trust by clients, regulators, and the general public.

22.    In an effort to prop up Sequent's financial condition to meet ESAC standards, Hutter and the Interested Shareholders/Directors approved the sale of the shareholder loans to ABL in October 2005, which sale was scheduled to be completed on December 31, 2005.

23.    Hutter and the Interested Shareholders/Directors caused ABL to purchase the shareholder loans from Sequent.  ABL had only $90,000 in available cash, which it paid to Sequent.  Because ABL had no other cash with which to prop up Sequent's financial condition, on or about January 12, 2006, Hutter and the Interested Shareholders/Directors of Sequent caused the TRUST to pay $257,918 in cash to ABL, and then caused ABL to transfer $257,918 in cash to Sequent to pay the balance of the loan sale.

24.    These acts were accomplished utilizing telephone, Internet and/or through the mail.

25.    These acts violated, without limitation, 18 U.S.C. § 664 (theft or embezzlement from a benefit plan), and § 669 (theft or embezzlement in connection with health care), and ERISA sections 404(A)(1)(A) and (B), and 406(b)(1)(B) and (D).

26.    On or about January 27, 2006, DOL served written notice on Sequent that it was under criminal investigation.

27.    Upon learning of the DOL criminal investigation into, among other things, the loan sale, Hutter and the Interested Shareholders/Director attempted to reverse the theft of funds from the TRUST by transferring funds from Sequent back to ABL, and from ABL back to the TRUST. The transaction reversal was completed on or about February 27, 2006.

28.    Later in 2006, because Hutter and the Interested Shareholders/Directors were unwilling or unable to repay the shareholder loans to Sequent, Hutter and the Interested

8

Shareholders/Directors caused Sequent to forgive the shareholder loans to themselves. The forgiveness of these loans served no legitimate business purpose to Sequent.

29.    At a meeting of Sequent's board of directors held during 2009, commenting upon the DOL's allegation that Sequent was unlawfully misusing TRUST funds, at least one Interested Shareholder/Director acknowledged that Sequent used the TRUST as its "piggy bank."

## C. Illegal Administrative Fees Pre-Merger

30.    On information and belief, ABL performed services for the Plan and the TRUST. Under ERISA, ABL was permitted to charge an administrative fee for its services limited to its direct costs actually and properly incurred in connection with the services provided to the Plan and the TRUST.

31.    In or about mid-2005, Hutter and the Interested Shareholders/Directors caused ABL to increase its fees to be charged to the Plan and TRUST in excess of ABL's direct costs actually and properly incurred. Hutter and the Interested Shareholders/Directors caused Sequent to accept and pay those excessive fees on behalf of the Plan and TRUST. As a result, fees paid by the Plan and TRUST to ABL increased from approximately $500,000 on an annual basis, to approximately $1,020,000 on an annual basis.

32.    On information and belief, ABL charged excessive fees to the Plan and TRUST beginning in 2005 and continuing into 2006.

33.    These acts were accomplished utilizing telephone, Internet and/or through the mail.

34.    These acts violated, without limitation, 18 U.S.C. § 664 (theft or embezzlement from a benefit plan), and § 669 (theft or embezzlement in connection with health care), ERISA sections 404(a)(1)(A) and (B), 406(b)(1) and (2), and 406(a)(1)(C).

35.    On or about January 27, 2006, the DOL informed Sequent that the DOL was conducting a criminal investigation of Sequent for, among other things, illegal administrative fees charged to the TRUST.  Just one business day later, on January 30, 2006, Hutter stated, in writing, that the ABL budget may need to be amended.  In March 2006, Hutter instructed Sequent employees to suspend all further payments from the TRUST to ABL.

**D. Illegal Inflation of Insurance Charges Pre-Merger**

36.    On information and belief, beginning prior to the Merger, Sequent, in addition to charging client Jobsite Employers an administrative fee for services provided, inflated the insurance premiums charged to it by insurance companies, and charged those inflated premiums to its client Jobsite Employers, to Jobsite Employees, and to its own Corporate Employees, misrepresenting those charges to be the actual premiums charged by the insurance companies.

37.    When Sequent received payments from its employer-clients, or deducted the inflated premiums from the pay of the Jobsite Employees or Corporate Employees, Sequent deposited into the TRUST only an amount equal to the actual insurance premium charged by the insurance companies and retained the balance for its own benefit.

38.    These acts were approved by Hutter and the Interested Shareholders/Directors, and accomplished utilizing telephone, Internet and/or through the mail.

39.    These acts violated, without limitation,  18 U.S.C. § 664 (theft or embezzlement from a benefit plan), and § 669 (theft or embezzlement in connection with health care), ERISA sections 404(a)(1)(A) and (B), 406(b)(1) and (2), and 406(a)(1)(C).

40.    On or about January 27, 2006, the DOL served written notice on Sequent that it was under criminal investigation by the DOL, for, among other things, the illegal inflation of insurance charges.

10

41.    Upon information and belief, after the DOL informed Sequent that the DOL was conducting a criminal investigation on January 27, 2006, Sequent claims to have stopped this practice.

**E. Illegal Tiering of Insurance Premiums to Sequent's Jobsite Employer Clients**

42.    Under ERISA, the TRUST is a multiple employer welfare arrangement ("MEWA"). A MEWA is an arrangement used to provide benefits to the employees of one or more employers, here, Sequent's Jobsite Employer clients. Sequent's Jobsite Employer clients are unrelated to one another and do not share a common economic interest. Thus, by actual operation, the Sequent administers health plans for each participating Jobsite Employer client of Sequent, and each such Jobsite Employer client maintains a separate ERISA plan with plan assets held by the TRUST.

43.    As the administrator for the various ERISA plans, Sequent operates the plans and the TRUST in such a manner that some clients are unknowingly overcharged to fund their plans while the costs to other clients to fund their plans are subsidized. Sequent secretly refers to this scheme as "Tiering." Hutter and the Interested Shareholders/Directors have referred to "Tiering" as the core of Sequent's business model. In essence, Sequent uses assets from certain Jobsite Employer client plans to pay the premiums for the benefits of other Jobsite Employer client plans.

44.    Although the Plan and the TRUST pay the same individual or family health insurance premium for each employee irrespective of his or her Jobsite Employer, using the Tiering scheme Sequent charges each Jobsite Employer an amount that is more or less than the sum of the actual premiums for which that Jobsite Employer is responsible, depending upon the competitive circumstance of that Jobsite Employer. Sequent uses TRUST funds to subsidize the

rates it charges some Jobsite Employers to meet competition, while it up-charges rates to other Jobsite Employers in an effort to make up the difference. However, Sequent has not been able to collect enough up-charges to offset the below cost subsidies it has given out. As a result, the TRUST has for a number of years had insufficient funds to pay premiums. So that the TRUST could make premium payments when due, Hutter and the Interested Shareholders/Directors have caused Sequent to loan money to the TRUST. The TRUST, which should have no debt, has an accumulated debt to Sequent which now totals in excess of $1.5 million.

46.     Through its Tiering scheme and for its own interest, Sequent uses TRUST, plan and client funds to offer below cost rates to certain clients, thereby increasing its number of clients and the earnings it generates from those clients. Tiering is unlawful, in part, because it constitutes the theft, misuse or embezzlement of funds from the TRUST and from each of the plans for which the TRUST holds funds. Sequent's Tiering scheme also constitutes a fraud upon Sequent's Jobsite Employer clients.

46.     Escue learned of Sequent's Tiering scheme in 2006, during discussions with Hutter that led ultimately to Escue's sale of BBSA to Sequent in exchange for Sequent stock, Hutter described the Tiering as a competitive advantage, as a visionary process and as a practice unique to Sequent among PEOs. Hutter verbally misrepresented Sequent's Tiering scheme to Escue, assuring Escue that Tiering was legal, that it had been approved by specialized ERISA counsel, and that it was the secret of Sequent's success. Impressed by Sequent's innovation, Tiering was a material reason that Escue decided to merge BBSA into Sequent.

47.     At a Sequent board of directors meeting in June 2009, Escue learned that at a meeting between Sequent's counsel and representatives of the DOL and the U.S. Attorney's office to discuss the ongoing criminal investigation of Sequent, the government representatives

charged that Sequent's Tiering scheme was unlawful. At that same board of directors meeting,

Escue learned that contrary to Hutter's representations, the Tiering scheme had never been

approved by specialized ERISA legal counsel.

48.    Section 404(a) of ERISA imposes broad duties on ERISA plan fiduciaries.

Specifically, Section 404(a) states that:

> A fiduciary shall discharge his duties with respect to a plan solely in the interest
> of the participants and beneficiaries and-- (A) *for the exclusive purpose of: (i)*
> *providing benefits to participants and their beneficiaries*; and (ii) *defraying*
> *reasonable expenses of administering the plan*; (B) with the care, skill, prudence,
> and diligence under the circumstances then prevailing that a prudent man acting in
> a like capacity and familiar with such matters would use in the conduct of
> an enterprise of a like character and with like aims; (C) by diversifying the
> investments of the plan so as to minimize the risk of large losses, unless under the
> circumstances it is clearly prudent not to do so; and (D) in accordance with the
> documents and instruments governing the plan insofar as such documents and
> instruments are consistent with the provisions of this subchapter and subchapter
> III of this chapter.

> [Emphasis added.]

49.    In addition, a fiduciary is prohibited from entering into self dealing transactions

using plan assets. Section 406(b) of ERISA states:

> A fiduciary with respect to a plan shall not-- (1) *deal with the assets of the plan in*
> *his own interest or for his own account,* (2) in his individual or in any other
> capacity act in any  transaction involving the plan on behalf of a party (or
> represent a party) whose interests are adverse to the interests of the plan or the
> interests of its participants or beneficiaries, or (3) receive any consideration for
> his own personal account from any party dealing with such plan in connection
> with a transaction involving the assets of the plan.

> [Emphasis added.]

50.    A fiduciary violating these prohibitions may be held liable for civil penalties,

excise taxes and be held personally liable for any damages the Plan and/or TRUST incurs as a

result of the breach of fiduciary duty.

51.    Sequent, as the plans' administrator, exercises discretion over the assets of the plans serviced by the TRUST, including related assets, and is a fiduciary to each of the multiple ERISA plans formed by virtue of the MEWA.  As a fiduciary, Sequent owes a duty to each plan's participants and beneficiaries.

52.    Sequent's Tiering scheme is a misuse of plan assets and a breach of Sequent's fiduciary duty under Section 404(a)(1), and a prohibited transaction under Section 406(b) of ERISA, for use of plan assets for its own interest.

**F. Illegal Rate Upcharging Pre- and Post-Merger**

53.    Sequent provides vision and dental insurance plans for its Jobsite Employer clients and their Jobsite Employees, as well as its own Corporate Employees, including Escue. Generally, the cost of vision or dental coverage is paid by the employee, though some Jobsite Employers  pay some or all of the cost of Jobsite Employees.

54.    Sequent also provides the opportunity for Jobsite Employees and Corporate Employees to continue their insurance coverage after separating from employment under COBRA.  COBRA requires that the actual cost of insurance premiums be charged and allows a 2% markup for to cover administrative expenses.

55.    Upon information and belief, Sequent has, since at least 2005, arbitrarily inflated premiums charged for vision and dental coverage, and for COBRA coverage, above the actual cost of the insurance premium and reasonable expense of administering the plans.  It has done so secretly, without advising its Jobsite Employees or their Jobsite Employers, or Sequent's own Corporate Employees.  Sequent again inflated the rates for vision and dental, and for COBRA coverages effective July 1, 2009, in some instances more than twenty percent above the actual vision and/or dental insurance premiums charged by the insurance carrier, and in some instances

14

more than 37% above the actual premium for coverage mandated under COBRA. Escue recently recognized the inflation on his own vision and dental coverage payments because he was aware of the insurance carrier's actual premium charges.

56.    On information and belief, Sequent has inflated vision and dental, and COBRA coverage rates paid by the Jobsite Employees and/or the Jobsite Employers, and by Corporate Employees, to generate cash to support its illegal Tiering scheme, and/or for Sequent to skim extra monies collected, and/or to pay legal fees of Sequent, Hutter and/or the Interested Shareholders/Directors, none of which constitute reasonable administrative expenses.

57.    Sequent's inflation of vision and dental insurance premium rates violates, without limitation, Section 404(a) of ERISA, which requires that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and their beneficiaries, plus reasonable expenses of administering the plan. Sequent's inflation of the rates charged above actual COBRA-related insurance premiums plus up to a 2% markup for actual administrative charges violates COBRA.

## G. Illegal Undisclosed "Risk Management Fee" Masked as a "Direct Cost" to Sequent Clients Pre-and Post-Merger

58.    Upon information and belief, Sequent has, since at least 2005, charged its Jobsite Employer clients an administration fee for its services. The administration fee is a percentage of the sum of actual wages paid plus what was and is represented to be "Direct Costs." Sequent represents to its clients that "Direct Costs" are comprised of, among other things, various insurance costs, accreditation fees and costs of the PEO, and actual corporate legal costs.

59.    Sequent conceals and does not disclose to its Jobsite Employer clients that hidden within "Direct Costs" is a so-called "risk management fee." The risk management fee represents

no cost at all but is a charge arbitrary in amount and arbitrarily imposed for no purpose other than to fraudulently pad its charges to its clients.

60.    Sequent has secretly and arbitrarily increased the risk management fee portion of the supposed "Direct Costs" charged to its clients on multiple occasions over time. The fictitious risk management fee is not a direct cost at all, but rather, a fraudulent and covert fleecing of clients.

**H. Merger of BBSA into Sequent**

61.    In 2006 and during a time when Escue was unaware of the DOL criminal investigation, Escue and Hutter discussed their respective PEO businesses. Escue and Hutter were generally familiar with one another as owners of widely-recognized PEOs, albeit whose companies were located in different geographic areas. Based on discussions with Hutter in which Hutter described Sequent's purportedly unique business model, Escue became interested in merging BBSA with Sequent. Those discussions evolved into negotiations, culminating in a Merger Agreement, entered on December 20, 2006, effective January 1, 2007.

62.    In or about April, 2006, in a conversation with Escue, Hutter allowed that Sequent was the subject of a routine DOL "audit." Escue thought nothing of it because the DOL routinely audits PEOs. In subsequent conversations and negotiations about a possible merger of BBSA and Sequent, Hutter consistently referred to what he knew to be a DOL criminal investigation as an "audit." Hutter's description of the DOL criminal investigation as a routine DOL "audit" was false and made with intent to mislead Escue and conceal the truth from him. Never, prior to consummation of the Merger, did Hutter reveal to Escue that Sequent was in fact the subject of a DOL criminal investigation; nor did Hutter reveal to Escue the matters which were the subject of the criminal investigation.

63.    In or about December 2006, Sequent and Escue, through counsel, exchanged

drafts of the Merger Agreement and related documents. Article VI of the draft, as well as the

same Article of the executed version of Merger Agreement, sets forth the Representations and

Warranties of Sequent.

64.    In Article VI, Sequent represented and warranted to Escue that the statements

contained in Article VI and its associated schedules "are correct and complete as of the date of

this Agreement and will be correct and complete immediately prior to the Effective Time

[January 1, 2007] . . ."

65.    Among the representations and warranties by Sequent to Escue in the Merger

Agreement were:

> § 6.05 – **Permits; Compliance**.
>
> "[. . . ] Neither Sequent nor any Subsidiary of Sequent has operated (nor
> is Sequent or any Subsidiary of Sequent currently operating) in violation
> of any Law applicable to Sequent or such Subsidiary of Sequent or by
> which their properties are bound or affected, except where such operation
> would not, or has not, individually, or in the aggregate, have a Material
> Adverse Effect on Sequent."
>
> § 6.06 – **Reports; Financial Statements**.
>
> (a)    Since its incorporation, Sequent and each of its Subsidiaries has
> filed all forms, reports, statements and other documents required to be
> filed with all applicable federal or state regulatory authorities (all such
> forms, reports, statements and other documents, including any amendment
> thereto, being collectively referred to as the "**Sequent Reports**"). Sequent
> Reports were prepared in all material respects in accordance with the
> requirements of applicable law.
>
> § 6.08 – **Litigation**.  Schedule 6.08 of Sequent Disclosure Schedule lists
> all claims, actions, suits, litigations, proceedings, arbitrations or
> investigations of any kind against Sequent or involving any of its assets
> which are pending or, to Sequent's knowledge, threatened. Except as set
> forth in Schedule 6.08 of Sequent Disclosure Schedule, Sequent is not

subject to any continuing order of, consent decree, settlement agreement or other similar written agreement with, or, to the knowledge of Sequent continuing investigation by, any Governmental Entity, or any judgment order, write, injunction, decree or aware of any Governmental Entity or arbitrator, including without limitation, cease-and-desist orders.

### § 6.10 – **Employee Benefit Plans; Labor Matters**.

(d)     With respect to the Employee Benefit Plans:

      (i)     With respect to each of the Employee Benefit Plans that is subject to ERISA, other than a plan described in Section 3(2) of ERISA, the Company has at all times and continues to operate such plans in compliance (both in form and operation) with ERISA, the Code and all other applicable laws; no Employee Benefit Plan is subject to Title IV of ERISA or the funding provisions of Section 412 of the Code.

      (ii)     Except as otherwise disclosed on Schedule 6.10(d) of Sequent Disclosure Schedule, there are no pending, or to the knowledge of Sequent, threatened or anticipated material claims (other than routine claims for benefits) by, on behalf of or against any of the Employee Benefit Plans, the fiduciaries of such plans or any trust related thereto.

### § 6.19 **Disclosure**.

No representation or warranty contained in this Article VI, as qualified by Sequent Disclosure Schedule, or in any Schedule or Exhibit hereto or any closing certificate furnished or to be furnished by Sequent to either the Company or the Shareholder pursuant to this Agreement or in connection with the Merger contains or, at the Effective Time [January 1, 2007], will contain any untrue statement of a material fact, or omits or, at the Effective Time [January 1, 2007], will omit to state a material fact necessary to make the statements contained herein or therein not misleading.

66.     Among the contractual provisions in the Merger Agreement were:

### § 8.04 – **Survival of Representations and Warranties; Indemnification**.

(a)     Notwithstanding any right of any party to the Agreement to fully investigate the affairs of any other party to the Agreement and notwithstanding any knowledge of facts determined or determinable by

any party pursuant to such investigation or right of investigation, each party to the Agreement has the right to rely fully upon the representations and warranties of any other party to the Agreement contained in this Agreement or in any Schedule or Exhibit or Agreement in connection with the Merger. . .

### § 9.01 – Conditions to Obligations of Each Party Under This Agreement.

[ . . . ]

(a)(iv)  Sequent shall have performed or complied in all material respect with all agreement and covenants required by this Agreement to be performed or complied with on or prior to the Effective Time [January 1, 2007].  The Company [BBSA] shall have received a certificate of Sequent, executed by the Chief Executive Officer of Sequent [Hutter], to that effect;

[ . . . ]

(b)(vi)  The Agreement and the Merger shall have been approved by the board of directors and shareholders of Sequent.

67.    On December 14, 2006, Sequent's counsel provided Escue's counsel with Sequent's draft disclosure schedules.  Schedule 6.08 of both the draft disclosure and the final disclosure stated:

> Governmental Investigations
> DOL Investigation into Sequent's Section 125 Plan.

68.    Relying upon Hutter's prior representations that Sequent was the subject of a routine DOL audit, Escue understood and reasonably believed the DOL investigation referred to in Schedule 6.08 was the routine audit of Sequent's employee benefit plan earlier referenced by Hutter.  At no time prior to the effective date of the Merger did Hutter, the Interested Shareholders/Directors, or anyone else associated with Sequent advise Escue that Sequent and one or more directors of Sequent were the subject of a DOL criminal investigation into, among

other things, the illegal transfer of funds from the TRUST to the related entity to fund the purchase promissory notes which Sequent held from Hutter and the Interested Shareholders/Directors; the illegal payment of fees from the TRUST to ABL, an entity which Hutter and the Interested Shareholders/Directors also owned and operated as its directors; and/or the illegal inflation of health insurance premiums.

69.    At no time prior to the effective date of the Merger did Hutter, the Interested Shareholders/Directors, or anyone else associated with Sequent advise Escue that Sequent's core business model was illegal and/or that Sequent illegally inflated dental and vision plan rates above legally permissible amounts.

70.    At no time prior to the effective date of the Merger did Hutter, the Interested Shareholders/Directors, or anyone else associated with Sequent advise Escue that Sequent or any of its listed merger subsidiaries had operated, or were currently operating in violation of any applicable law as represented and warranted at §§ 6.05 and 6.19 of the Merger Agreement.

71.    At no time prior to the effective date of the Merger did Hutter, the Interested Shareholders/Directors, or anyone else associated with Sequent advise Escue that Sequent's employee benefit plans had not operated and/or at that time were not operating in compliance with ERISA and other relevant laws, and/or that they had knowledge of threatened or material claims against any of the employee benefit plans of Sequent, or the fiduciaries of such plans or any related trust, as represented and warranted at §§ 6.10 and 6.19 of the Merger Agreement.

72.    Instead, Hutter signed the Merger Agreement and a Closing Certificate for the merger as C.E.O. and President of Sequent, and both Hutter and the Interested Shareholders/Directors approved the Merger Agreement as evidenced by a signed corporate

resolution entitled Joint Action of Directors and Shareholders Without a Meeting, which was effective December 19, 2006.

73.    By doing so, Hutter and the Interested Shareholders/Directors fully affirmed the content of the Merger Agreement.

74.    Yet on or before January 27, 2006 -- over eleven months prior to the date of the Merger Agreement -- Sequent had been notified that the DOL was conducting a criminal investigation into Sequent.

75.    On information and belief, throughout 2006, Hutter and the Interested Shareholders/Directors were aware of the criminal investigation by DOL, but neither Hutter nor anyone else associated with Sequent advised Escue of the DOL's criminal investigation prior to the consummation of the Merger.

76.    On information and belief, throughout 2006 and prior to the effective time of the Merger Agreement, Hutter was aware that no legal counsel had opined that Sequent's core business model of Tiering was legally permissible.

77.    On information and belief, throughout 2006 and prior to the effective time of the Merger Agreement, the Directors of Sequent – Hutter and the Interested Shareholders/Directors – knew or should have known of the illegal rate inflation by Sequent as to vision and dental plans, and COBRA coverage, above legally permissible amounts, but neither Hutter and the Interested Shareholders/Directors, nor anyone else associated with Sequent advised Escue of the illegal inflation prior to the consummation of the Merger.

78.    The Merger of BBSA and Sequent's merger subsidiary became effective on January 1, 2007.

79.    Pursuant to the terms of the Merger Agreement, all of Escue's shares of common stock in BBSA were cancelled and converted into the right to receive 14,000 shares of Sequent common stock. Upon completion of the merger, Escue became a shareholder of Sequent and a member of its board of directors.

80.    The number of shares that Escue acquired from Sequent was based directly on the financial statements of both Sequent and BBSA. BBSA and Sequent employed a common business valuation expert to value both companies They provided her with their 2005 financial statement and projections for 2006. BBSA was valued at $1,871,630. Sequent was valued at $14,973,040. Sequent's 2005 financial statement and projections for 2006 were fraudulent, not only because Sequent's income was inflated by the fraudulent and illegal practices described above, but because Sequent failed to disclose to the business valuation expert that Sequent was the subject of a DOL criminal investigation. That fact was material and would have caused the business valuation expert to recommend that the Merger not be consummated.

81.    Sequent's 2006, 2007 and 2008 financial statements also fail to disclose the pendency of the DOL criminal investigation. The existence of the DOL criminal investigation is a material fact, the absence of which made Sequent's financial statements false and misleading to anyone who relied on them.

82.    Hutter and the Interested Shareholders/Directors approved Sequent's financial statements. Hutter and the Interested Shareholders/Directors, whose numbers include an experienced corporate attorney and several CPAs, knew, or should have known, that the financial statements were fraudulent and misleading.

83.    In fact, the financial statements of Sequent used for valuation purposes as to the Merger Agreement contained material misrepresentations and/or omissions, which included,

without limitation, the failure to properly reflect liability for violations of ERISA and/or material claims against plans, fiduciaries or any related trusts, and the failure to adequately disclose that the criminal nature and severity of the DOL investigation.

84.    Nevertheless, Sequent, Hutter and the Interested Shareholders/Directors affirmed that no representation or warranty in Article IV of the Merger Agreement or in any schedule contained at the effective time of the merger, any untrue statement of a material fact or omit to state a material fact necessary to make any statement not misleading, which included, among other sections, §§ 6.06 and 6.19 of the Merger Agreement as to reports and financial statements, which were represented and warranted to have been prepared in all material respects in accordance with applicable law.

## I. Post-Merger Notice to Michael Escue of Department of Labor Criminal Investigation and Illegal Acts

85.    After the Merger was effective, Escue joined Sequent's board of directors. Although Sequent's board met monthly, the pending DOL criminal investigation was never mentioned until a Sequent board of directors meeting held on September 24, 2007. At that meeting, the investigation was mentioned in such a way that it would appear to Escue that a routine DOL audit had suddenly turned into a criminal investigation. This was Escue's first notice that Sequent was the subject of a DOL criminal investigation. He was not told at that time that the criminal investigation had been ongoing since at least January 2006.

86.    Thereafter, at subsequent Sequent board of directors meetings, only casual and passing reference was made to the pending criminal investigation and the threat that it might represent to the company was downplayed and dismissed.

23

87.    Then, consistent with the manner in which the criminal investigation had been reported over the past nine months, Hutter and Sequent General Counsel Darrell Hughes reported at a board meeting held on June 23, 2008, that a tentative settlement had been reached with the DOL that would resolve all outstanding DOL issues, including the criminal investigation. In fact that report was false and intended to elicit Escue's vote authorizing Sequent to pay the TRUST $230,000 in connection with a proposed settlement of DOL's civil claim that ABL had received unlawful payments from the TRUST.

88.    The $230,000 settlement which Sequent's directors authorized be paid by Sequent to the TRUST was the obligation of ABL and its owners Hutter and the Interested Shareholders/Directors, as it was ABL that had received the illegal payments from the TRUST. Because Hutter and the Interested Shareholders/Directors were "interested," their votes could not count towards the authorization of Sequent to pay $230,000 on behalf of ABL for the settlement payment under Ohio Revised Code § 1701.60. Escue was the only director of Sequent not "interested" and therefore his vote was the only valid vote for the authorization of Sequent to pay $230,000 on behalf of ABL for the settlement payment.

89.    Hutter's and Hughes' report to Sequent's board of directors was false and misleading in that it misrepresented or failed to disclose two material facts: First, the civil claim being settled related only to ABL's having received illegal payments from the TRUST; and second, that the settlement would not resolve the criminal violations which were the subject of the DOL's on going criminal investigation. Escue understood from Hutter's and Hughes' report just the opposite: That the claim proposed to be settled was Sequent's obligation and all issues related to the ongoing investigation would be resolved by the payment.

90.    Relying upon Hutter's and Hughes' false and misleading report given at the June 23, 2008 board meeting, and the active silence of the Interested Shareholders/Directors in the face of a report they knew to be false and misleading, Escue cast his vote in favor of Sequent's paying the $230,000 settlement.

91.    Hutter's and Hughes' false and misleading report and active silence of the Interested Shareholders/Directors were intended to deceive Escue into voting in favor of the settlement payment, as his was the only vote not disqualified by law. Hutter's and Hughes' false and misleading report did not and was not intended to mislead Sequent's other directors as they were fully informed of the criminal investigation, including the allegation that ABL, which they owned, had received unlawful payments from the TRUST for which they had personal liability. The Interested Shareholders/Directors were complicit in the effort to mislead Escue.

92.    After the June 23, 2008 board meeting, until a board meeting held on or about December 10, 2008, no update on the still pending DOL investigation was given to the board, or on the efforts to settle the issues which are the subject of that investigation. Until November, 24, 2008, Escue assumed from the silence that the settlement had been consummated and the investigation closed.

93.    After the adjournment of the board meeting held on November 24, 2008, Escue was shocked to overhear other board members reveal that the criminal investigation had not been resolved but was continuing, and that the DOL sought interviews of various Sequent board members (not including Escue), and that a meeting between Sequent's counsel and the U.S. Attorney was imminent. Hutter promptly cut off further discussion in Escue's presence of the ongoing criminal investigation.

94.    At a Sequent board meeting held on or about December 10, 2008, Escue learned for the first time the full extent and severity of the DOL criminal investigation, including that the investigation had started in January 2006 or earlier, the nature of the allegations, the potential defendants and the applicable criminal statutes.

95.    At that board meeting or thereafter, Escue learned that as a result of the DOL criminal investigation:

> Sequent and various individuals including without limitation, Joe Cole, Bruce Miller, Greg Miller and Hutter, have incurred significant and otherwise unnecessary legal fees and other expenses which have been paid, entirely or partially, by the TRUST;

> Sequent has paid inflated severance packages to various former Sequent employees as hush money to minimize negative testimony from those ex-employees;

> Sequent, or the TRUST, has entered an unnecessary and/or inflated contract to former Sequent employee Bruce Miller and/or his business, Benefits Metrics, as hush money to minimize negative testimony from Mr. Miller; and

> Sequent, or the TRUST has paid the legal fees and other expenses of Hutter and the Interested Shareholders/Directors, including the payment of a $230,000 civil settlement with the DOL.

96.    All of the foregoing have diminished the value of Escue's Sequent shares. Sequent faces future legal and other expenses, penalties and/or fines, as well as the loss of future business due to the ongoing and unresolved DOL criminal investigation.  In addition, Sequent is

likely to face civil litigation exposure and liability once its unlawful business practices become known to its Jobsite Employer clients. All of the foregoing further diminishes the value of Escue's Sequent shares. As a result of the ongoing criminal investigation and unlawful business practices described above, Escue believes his Sequent shares have little or no value.

**FIRST CLAIM FOR RELIEF**
**(Rescission of Merger Agreement -- Breach of Contract)**

97.    Escue realleges the allegations in paragraphs 1 - 96 above as if fully rewritten herein.

98.    The representations and warranties made by Sequent in Article VI of the Merger Agreement, including but not limited to § 6.05, § 6.06, § 6.08, § 6.10, § 6.19, and via contractual provisions, including but not limited to § 8.04 and § 9.01, and affirmed by Hutter and the Interested Shareholders/Directors were false, inaccurate and/or incomplete and each constitute a breach of the Merger Agreement.

99.    These multiple breaches of the Merger Agreement are substantial and material to the Agreement.

100.    As a result of these multiple, substantial and material breaches of the Merger Agreement, Escue is entitled to an order rescinding the Merger Agreement, and for the disgorgement of the value of the use of Escue's assets from the time of Merger Agreement to date.

101.    Conditioned upon the relief sought, Escue hereby tenders and is ready, willing and able to return the shares of Sequent stock he received as consideration for execution of the Merger Agreement.

## SECOND CLAIM FOR RELIEF
### (Rescission of Merger Agreement -- Fraudulent Inducement)

102.    Escue realleges the allegations in paragraphs 1 - 101 above as if fully rewritten herein.

103.    Sequent, Hutter and the Interested Shareholders/Directors had a duty to accurately disclose to Escue all facts material to the Merger transaction.

104.    With knowledge that the DOL was conducting a criminal investigation into Sequent's activities, Sequent, Hutter and the Interested Shareholders/Directors knowingly and intentionally failed to inform Escue of the criminal investigation prior to consummation of the Merger with the intent to induce Escue to rely upon the omission.

105.    With knowledge that Sequent did not have a legal opinion that approved of its Tiering core business model practices, Hutter and Sequent, through Hutter as its CEO, President and director, knowingly and intentionally misrepresented to Escue that counsel had opined that Tiering was legal prior to consummation of the merger with the intent to induce Escue to rely upon the misrepresentation.

106.    Escue reasonably relied upon these misrepresentations in agreeing to sign and effectuate the Merger Agreement.  Had truthful, complete disclosures been made, Escue would not have consummated the Merger Agreement.

107.    As a result of the fraudulent inducement of Escue to enter into the Merger Agreement, Escue is entitled to an order rescinding the Merger Agreement, and for the disgorgement of value of the use of Escue's assets from the time of the merger to date.

108.    Conditioned upon the relief sought, Escue is ready, willing and able to return the shares of Sequent stock he received as consideration for execution of the Merger Agreement.

## THIRD CLAIM FOR RELIEF
### (In the Alternative to Counts 1 and 2 -- Damages)

109.    Escue realleges the allegations in paragraphs 1 - 108 above as if fully rewritten herein.

110.    As a proximate result of the misrepresentations of Sequent, Hutter and/or the Interested Shareholders in fraudulently inducing Escue to enter into the Merger Agreement, Escue has been damaged in an amount in excess of $75,000.

111.    As a proximate result of fraudulent concealment of the existence of the DOL criminal investigation by Sequent, Hutter and/or the Interested Shareholders/Directors, Escue has been damaged in an amount in excess of $75,000.

112.    As a proximate result of fraudulent concealment of the legality of the Tiering core business model practiced by Sequent, and misrepresented by Sequent and Hutter, Escue has been damaged in an amount in excess of $75,000.

113.    As a proximate result of fraudulent concealment of the illegal rate upcharging of Sequent to its Jobsite Employees, Jobsite Employers and/or Corporate Employees by Sequent, Hutter and/or the Interested Shareholders/Directors, Escue has been damaged in an amount in excess of $75,000.

114.    Sequent, Hutter and/or the Interested Shareholders/Directors acted with actual malice in fraudulently inducing Escue to enter into the Merger Agreement, fraudulently concealing the DOL criminal investigation, fraudulently misrepresenting the legality of Tiering,

29

and fraudulently concealing illegal rate upcharging. As a result, Escue is entitled to an award of punitive damages.

## FOURTH CLAIM FOR RELIEF
**(Rescission Based Upon Fraud in Violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), and Rule 10b-5)**

115.    Escue realleges the allegations in paragraphs 1 - 114 above as if fully rewritten herein.

116.    Sequent, Hutter and the Interested Shareholders/Directors had specific and actual knowledge that the DOL was conducting a criminal investigation into Sequent activities by virtue of having direct contact with the DOL, and understood the significance of that investigation by virtue of such contact and discussions with legal counsel for Sequent in defense thereof.

117.    Sequent and Hutter had specific and actual knowledge that no counsel had opined specifically on the legality Sequent's Tiering core business model practices prior to the Merger.

118.    Sequent, Hutter and the Interested Shareholders/Directors had specific and actual knowledge of Sequent's practice of upcharging vision, dental and COBRA premiums to Jobsite Employees, Jobsite Employers and/or Corporate Employees, above the actual premium plus reasonable or allowable costs to administer the plans.

119.    These defendants' direct participation in the Merger included their negotiation and/or execution and/or approval of the Merger Agreement, which negotiation, execution and/or closing was carried out across state lines over the telephone, via the Internet and through the mail.

120.    These defendants knowingly and intentionally failed to inform Escue of the above issues and/or the truth of the above issues to induce Escue to rely upon such omissions and/or misrepresentations, and these omissions and/or misrepresentations were material to the Merger transaction.

121.    Sequent, Hutter and the Interested Shareholders/Directors, directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of securities as to the merger of BBSA and Sequent as described in this Complaint, have knowingly, willfully or recklessly:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which have operated as a fraud upon the purchasers of such securities.

122.    By reason of the foregoing, Sequent, Hutter and the Interested Shareholders/Directors, directly or indirectly, have violated Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 codified at 17 C.F.R. §240.10b-5.

123.    As a proximate result of the violation of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, Escue is entitled to an order rescinding the Merger Agreement.

124.    Escue hereby tenders and is ready, willing and able to return the shares of Sequent stock he received as consideration for execution of the Merger Agreement.

## FIFTH CLAIM FOR RELIEF
### (In the Alternative to Count 4 -- Damages)

125.    Escue realleges the allegations in paragraphs 1 - 124 above as if fully rewritten herein.

126.    As a proximate result of the violation of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 as codified at 17 C.F.R. §240.10b-5 by Sequent, Hutter and the Interested Shareholders/Directors, Escue has been damaged in an amount in excess of $75,000.

127.    Sequent, Hutter and the Interested Shareholders/Directors acted with actual malice in violating Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 as codified at 17 C.F.R. §240. 10b-5. As a result, Escue is entitled to an award of punitive damages against these defendants, jointly and severally.

## SIXTH CLAIM FOR RELIEF
### (Statutory False Statement Claim -- O.R.C. §1701.93(A)(1))

128.    Escue realleges the allegations in paragraphs 1 - 127 above as if fully rewritten herein.

129.    The misrepresentations and omissions by Hutter and each of the Interested Shareholders/Plaintiffs set forth above constitute false statements under O.R.C. §1701.93(A)(1).

130.    The misrepresentations and omissions were made with the intent to deceive.

131.    Escue has suffered actual damage proximately resulting from the false statements of each of the Interested Shareholders/Plaintiffs.

132.    Pursuant to O.R.C. §1701.93(B), Hutter and each of the Interested

Shareholders/Directors are personally liable, jointly and severally, for any damages suffered by

Escue as a proximate result of the false statements.

### SEVENTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

133.    Escue realleges the allegations in paragraphs 1 - 132 above as if fully rewritten

herein.

134.    Hutter and the Interested Shareholders/Directors were at all relevant times,

directors of Sequent.

135.    Sequent is a close corporation under Ohio law.

136.    Hutter and the Interested Shareholders/Directors owe a fiduciary duty to Sequent,

as well as to, among others, all shareholders of Sequent.

137.    As the administrator of the various benefit plans using the TRUST, Sequent owes

a fiduciary duty to the plans' participants and beneficiaries.

138.    Through Tiering, Sequent has misappropriated plan assets for its own interest and

use.  Furthermore, on information and belief, Sequent has, since at least 2005, inflated the

premium collected from participants above the actual insurance premiums or the amount

necessary to provide benefits to participants and their beneficiaries, plus reasonable expenses of

administering the plans, or with respect to COBRA, more than 2% above the actual premium

from the insurer.

139.    Most recently, effective July 1, 2009, Sequent again inflated the rates it charges

for vision, dental and COBRA coverages over actual premiums, plus reasonable expenses of

administering the plan, or with respect to COBRA, more than 2% above the actual premium from the insurer.

140.    Sequent's misappropriation of plan assets constitutes a breach of its fiduciary duties under Section 404 of ERISA and a prohibited transaction under Section 406(b) of ERISA. In addition, the inflated rates for vision, dental and COBRA coverage violate, without limitation, Section 404(a) of ERISA, which require that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and their beneficiaries, plus reasonable expenses of administering the plan.

141.    The misappropriation of plan assets and the upcharges constitute a breach of fiduciary duty of Sequent as to health, vision, dental and/or COBRA coverage participants and beneficiaries, and of Hutter and the Interested Shareholders/Directors with respect to all shareholders who knew or should have known of this illegal Tiering scheme and inflated premiums practice.

142.    Plaintiff Michael Escue is a participant in health, vision and dental plan funded by the TRUST and administered by Sequent. He has been and continues to be damaged by the legally impermissible, inflated rates.

143.    Plaintiff Michael Escue is also a shareholder in Sequent. He has been and continues to be damaged by the exposure to liability to the value of his shares in Sequent based on Sequent's liability exposure to other participants in the vision, dental and/or COBRA coverages, which are set at legally impermissible, inflated rates.

144.    Plaintiff Michael Escue, as a shareholder in Sequent, has also been damaged by the actions of Hutter and the Interested Shareholders/Directors whereby Escue was induced, as described above, to vote to use $230,000 of Sequent funds to pay for a DOL civil investigation settlement. Escue has similarly been damaged by Hutter and Interested Shareholder/Directors' actions that caused Sequent to pay unnecessary expenses including without limitation, legal fees and expenses, inflated severance agreements and/or one or more unnecessary and inflated contracts to a former employee and/or his business entity.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Michael R. Escue requests that judgment be entered in his favor and against Defendant Sequent as follows:

1.    On the First, Second, and Fourth Claims for Relief, an order rescinding the Merger Agreement and an order requiring Sequent, its officers, directors, employees and agents to take all steps necessary to effectuate the Court's rescission order, including without limitation, the appointment of a receiver, and for the disgorgement of the value of the use of Escue's assets from the time of the Merger Agreement to date.

2.    In the alternative, on the Third and Fifth Claims for Relief, an award of damages in an amount in excess of $75,000, the exact amount to be determined at trial, and an award of punitive damages.

3.    On the Sixth Claim for Relief, an award of damages in an amount in excess of $75,000.

4.    On the Seventh Claim for Relief, an order requiring Sequent and/or any other individual fiduciaries responsible for the Tiering scheme and illegal upcharge of premiums to

35

cease their illegal misappropriation of plan assets and illegal inflation of rates, and to reimburse all benefit plans administered by Sequent and/or using the Trust for damages incurred as a result of the Tiering scheme and illegal upcharge of premiums, and any other allowable relief under ERISA and/or COBRA available to the plans, participants and/or beneficiaries including, but not limited to, equitable relief. Additionally, an award is sought for damages in an amount in excess of $75,000.

5.   An award of expenses and costs of the suit, including reasonable attorney fees, as mandated contractually under the Merger Agreement, under common law and under ERISA.

6.   An award of such additional relief as is just and proper under all of the circumstances as determined by the Court.

> Michael J. Canter (0031015)
> Rodney A. Holaday (0068018)
> Vorys, Sater, Seymour and Pease LLP
> P.O. Box 1008
> 52 East Gay Street
> Columbus, Ohio 43216-1008
> Telephone:   (614) 464-6327
> Facsimile:   (614) 719-4655
> E-Mail :   mjcanter@vorys.com
>            raholaday@vorys.com

## JURY DEMAND

Plaintiff hereby demands trial by jury on all issues so triable.

> Michael J. Canter (0031015)

08/31/2009 Columbus 10693243