# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

MICHAEL R. ESCUE,

        Plaintiff,

                              **Case No. 2:09-cv-765**

    v.                       **JUDGE GREGORY L. FROST**

                                **Magistrate Judge Mark R. Abel**

SEQUENT, INC., et al.,

        Defendants.

## OPINION AND ORDER

This matter is before the Court for consideration of the following filings:

(1) a motion for summary judgment filed by Defendants Michael Schoonover, John Boyer, Glenn Gettman, Steven Kerber, and Thomas Ewers (ECF No. 145), a memorandum in opposition filed by Plaintiff Michael Escue (ECF No. 154), and a reply memorandum filed by Schoonover, Boyer, Gettman, Kerber, and Ewers (ECF No. 169);

(2) a motion for summary judgment filed by Defendants Sequent, Inc., William Hutter, Schoonover, Boyer, Gettman, Kerber, and Ewers (ECF No. 146), a memorandum in opposition filed by Escue (ECF No. 155), and a reply memorandum filed by Sequent, Inc., Hutter, Schoonover, Boyer, Gettman, Kerber, and Ewers (ECF No. 168);

(3) a motion for summary judgment filed by Escue (ECF No. 157), a memorandum in opposition filed by Sequent, Inc., Hutter, Schoonover, Boyer, Gettman, Kerber, and Ewers (ECF No. 153), and a reply memorandum filed by Escue (ECF No. 170);[1] and

---

[1] The non-sequential numbering of the briefing related to Escue's motion is a result of his having obtained leave to file an amended motion for summary judgment that did not necessitate changes in the previously filed memorandum in opposition. *See* ECF No. 157.

(4) a supplemental motion for summary judgment filed by Escue (ECF No. 182), a memorandum in response filed by Sequent, Inc. (ECF No. 183), and a reply memorandum filed by Escue (ECF No. 186).

For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** the motion for summary judgment filed by Sequent, Inc., Hutter, Schoonover, Boyer, Gettman, Kerber, and Ewers (ECF No. 146), **GRANTS IN PART** and **DENIES IN PART** the motion for summary judgment filed by Escue (ECF No. 157), and **GRANTS** the supplemental motion for summary judgment filed by Escue (ECF No. 182).  The motion for summary judgment filed by Schoonover, Boyer, Gettman, Kerber, and Ewers is **MOOT**.  (ECF No. 145.)

## I.  Background

This is a diversity action filed by Plaintiff, Alabama resident Michael R. Escue, against Defendant Sequent, Inc. ("Sequent"), a closely held Ohio corporation with its principal place of business in Dublin, Ohio.  Also named as defendants are William F. Hutter, the CEO and majority shareholder of Sequent, and Sequent shareholders and directors Chairman Michael L. Schoonover, Treasurer John E. Boyer, Glenn J. Gettman, Corporate Secretary Steven R. Kerber, and Thomas A. Ewers.

Escue was the sole shareholder of Better Business Solutions of Alabama, Inc. ("BBSA"), a professional employee organization ("PEO") located in Birmingham, Alabama, that provided human resource services to business clients in the Birmingham area.  PEOs provide services typically performed by a human resources department, including payroll, audit, tax management, the administration of employee benefit plans, employment and labor law compliance, workers' compensation claims, and risk management.

Sequent is also a PEO and provides human resource services, including health, dental, and vision insurance coverages, as well as coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") to its own employees and to business clients ("Jobsite Employers") and employees ("Jobsite Employees") leased by Sequent to Jobsite Employers. Sequent is the sponsor of the Sequent, Inc. Flexible Benefits Plan ("the Plan"), an employee benefit plan under the Employee Retirement Income Security Act of 1974 ("ERISA"). Sequent also created the Sequent Welfare Benefits Trust ("the Trust") for the purpose of holding the Plan assets, receiving premium payments received from Jobsite Employers and Employees and Sequent's own employees, and paying those premiums to insurers.

Hutter and the other individual defendants also formed Accompany Benefits, LLC ("ABL"), an Ohio limited liability company currently registered under the trade name SRBG. ABL was formed to offer consulting services in the areas of employee benefits design, life, health, and disability insurance, as well as retirement and nonqualified deferred compensation plans. ABL provides consulting services to Sequent, the Plan, and the Trust. ABL's shareholders and directors are Sequent's shareholders and directors.

Beginning in 2005 and continuing into 2006, Escue engaged in negotiations with Hutter concerning the merger of BBSA with Sequent. In August 2005 and again in April 2006, Hutter told Escue that Sequent was the subject of a routine audit by the Department of Labor ("DOL"). Escue was aware that the DOL routinely audited PEOs and thought that this information was not significant. During the negotiations, Hutter also described Sequent's business practice of "tiering," which consisted of charging some Jobsite Employers more for insurance premiums in order to subsidize the coverage provided to other Jobsite Employers who were charged lower

premiums in an effort to attract them as clients. Hutter represented that this practice was the reason for Sequent's success, that it was legal, and that it had been approved by specialized ERISA counsel. A business valuation expert was employed to value both companies based on the 2005 financial statements and projections for 2006. BBSA was valued at $1,756,455, and Sequent was valued at $14,973,040.

Escue alleges that a draft of the proposed merger agreement was exchanged in December 2006. Section 6.08 of the merger agreement disclosed that Sequent was the subject of a "DOL Investigation into Sequent's Section 125 Plan." Escue apparently assumed that this meant the routine audit which was referred to by Hutter during the negotiations. Hutter and the other individual defendants signed a corporate resolution, effective December 19, 2006, which approved the merger agreement. Escue then signed the agreement, and Hutter signed the merger agreement and a closing certificate for the merger as CEO and President of Sequent. It is alleged in the first amended complaint that effective January 1, 2007, Sequent acquired BBSA through a merger transaction. Escue surrendered his BBSA shares, valued at $1,756,455, for 14,000 shares of Sequent common stock with a negotiated value of $1,871,630. After the merger, Escue became a director of Sequent and entered into an employment agreement with Sequent at an annual salary of $160,000 and incentive compensation in the amount of 10% of BBSA's earnings for the fiscal year.

According to Escue, in order to procure the merger between BBSA and Sequent, Hutter and the other individual defendants made false statements to him and concealed or failed to disclose material facts bearing upon the value of Sequent and the shares acquired by Escue pursuant to the merger agreement. Specifically, Escue alleges that prior to the merger, Sequent,

Hutter, and the other individual defendants engaged in improper and illegal activities that exposed Sequent to potential and actual financial liability and that adversely impacted the value of the Sequent shares acquired by Escue pursuant to the merger agreement. Escue also asserts that the financial statements provided to the valuation expert were false because Sequent failed to disclose material facts about Sequent, including the fact that Sequent had been the target of a DOL criminal investigation since January 2006.

Escue alleges that prior to the merger, Hutter and the other individual defendants approved a plan for Sequent to make loans in a total amount of $347,918 to the individual defendants. According to Escue, this resulted in Sequent's financial status failing to meet accounting standards established by the Employer Services Assurance Corporation, an entity that provides accreditation and client assurance programs for the PEO industry. To rectify this situation, Defendants allegedly approved the sale of the loans to ABL in October 2005. Because ABL allegedly only had $90,000 in available cash, Hutter and the other individual defendants allegedly caused the Trust to act in violation of ERISA by illegally paying $257,918 to ABL on January 12, 2006. ABL then transferred the money to Sequent.

On January 27, 2006, the DOL served written notice on Sequent that the company was under investigation. Hutter and the other individual defendants then reversed the transfer of funds by returning the $257,918 to the Trust as of February 27, 2006. Escue further alleges that later in 2006, Hutter and the other individual defendants arranged to have Sequent forgive the loans made to them.

Escue asserts he was not informed before the merger that Sequent was the subject of a DOL criminal investigation. He alleges that he first learned about the criminal investigation at a

September 24, 2007 Sequent board meeting.  Escue also asserts that he did not learn the full extent of the DOL criminal investigation until early December 2008, when Sequent's counsel issued a memorandum describing the investigation.  Escue alleges that as a result of the criminal investigation, various individuals, including Hutter, have incurred legal fees exceeding $1 million, which have been paid partially or entirely by the Trust, that Sequent has paid overinflated severance packages to or entered into unnecessary contracts with Sequent employees as "hush money," and that Sequent paid $230,000 to the DOL as a civil settlement that was really the obligation of ABL.  Escue asserts that the $230,000 is the amount of funds that ABL improperly obtained from the Trust.

In mid-2005, Hutter and the other individual defendants allegedly caused ABL to increase the fees it charged to the Plan and Trust, thereby doubling the amount of fees charged on an annual basis.  Escue further alleges that after being informed by the DOL that a criminal investigation had been commenced, Hutter instructed Sequent employees to suspend all further payments from the Trust to ABL.

Escue also asserts that prior to the merger, Hutter and the other individual defendants caused Sequent to charge its Jobsite Employer clients an inflated administrative fee for services provided, to misrepresent the amount charged by insurers for insurance premiums, and to overcharge employers for insurance premiums.  Sequent allegedly retained the difference between the inflated price and the actual cost of coverage charged by the insurers for its own benefit.  Escue alleges that Sequent stopped this practice after being informed of the DOL criminal investigation.

Additionally, Escue asserts that Sequent's practice of "tiering" by overcharging some

Jobsite Employer clients for insurance premiums in order to be able to offer other Jobsite Employer clients a lesser rate and attract more clients was illegal conduct constituting a breach of fiduciary duty under ERISA.  He alleges that since Sequent has been unable to charge enough in excess fees to support the below-cost subsidies, the Trust lacked sufficient funds to make premium payments.  Sequent has purportedly loaned money to the Trust in an amount exceeding $1.5 million to cover the cost of those premiums.  Escue further contends that Hutter's previous representations that the practice of "tiering" had been approved by specialized ERISA legal counsel were shown to be false at a director's meeting in June 2009, where Hutter proposed that Sequent ought to obtain an outside expert opinion and consultant on the issue of "tiering" and compliance with ERISA.

According to Escue, Sequent has since 2005 charged its clients and its own employees inflated rates for vision, dental, and COBRA coverage above the actual amount of administrative expenses and premium costs incurred by Sequent and the Trust.  Escue also alleges that since 2005, Sequent has charged its Jobsite Employer clients an administrative fee that includes a hidden "risk management fee" that did not reflect any administrative costs to Sequent, but rather was an arbitrary charge imposed solely for the fraudulent purpose of padding Sequent's fees.

Escue filed the instant action in September 2009.  He asserts twelve claims for relief in his amended complaint.  (ECF No. 19.)  Sequent in turn asserts two counterclaims against Escue in an amended answer.  (ECF No. 176.)  All of the parties have filed motions for summary judgment, all of which are now ripe for disposition.  (ECF Nos. 145, 146, 157, 182.)

## II.  Discussion

### A.  Standard involved

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case.  *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial.  *Id*. (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' "  *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

## B. Analysis[2]

### 1. Escue's First and Second Claims

In his first claim, Escue seeks the common law breach of contract remedy of rescission of the merger agreement. In his second claim, Escue alternatively asserts a breach of contract entitling him to monetary damages. This Court disagrees with Escue that he is entitled to summary judgment on these claims and agrees with Defendants that both claims are foreclosed by a survival clause contained in the merger agreement.

The survival clause is set forth at § 8.04 of the merger agreement, titled "Survival of Representations and Warranties; Indemnification." Subsection (b) of § 8.04 provides in relevant part that select representations and warranties "shall survive the execution and delivery of this Agreement and the Closing until the earlier of an initial public offering of Sequent's Common Stock or the second anniversary date of the Closing." (ECF No. 147-56, at 38.)[3] The subsection as a whole provides that some written representations among the parties shall never expire, some representations shall expire after seven years after the merger closes, and some shall expire two years after the merger closes. Of relevance here is the last category, quoted above, and its anniversary date provision. Based on the closing date, Defendants argue that § 8.04 bars non-exempted claims asserted after the second anniversary date of January 1, 2009.

Pursuant to the survival clause, the purported misrepresentations upon which Escue relies

[2] All pinpoint references to documents filed on the electronic docket shall be to the page numbers assigned by the electronic filing system each document, not to the original page numbers of the documents involved.

[3] Both sides have filed the merger agreement to support their briefing. For ease of reference, the Court shall refer only to the docket number of the merger agreement filed by Escue.

in his first two claims fall within expired representations as of January 1, 2009. Prior to this date, Escue's counsel sent a December 18, 2008 letter to Sequent, directed to the attention of Hutter. The letter stated that it constituted notice pursuant to § 8.04 of unspecified breaches of inaccuracies of Sequent representations and warranties, as well as the unidentified failure of Sequent to pay or perform as required under the merger agreement. (ECF No. 142-16, at 1.) The letter did not disclose any details behind the allegations. Escue now argues that the letter preserved his right to file claims against Sequent after January 1, 2009, which he did on September 2, 2009.

Nowhere in § 8.04 is there a provision that enables a party to extend the two-year expiration simply by providing notice. Section 11.12 of the merger agreement, however, provides that "[t]his Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto." (ECF No. 147-56, at 45.) Sequent therefore argues that Escue's letter serves as an intended unilateral modification of the merger agreement.

The Ninth Circuit provided a useful discussion on the effects of survival clauses in *Western Filter Corp. v. Argan, Inc.*, 540 F.3d 947 (9th Cir. 2008). In *Western Filter*, the court of appeals explained:

> The closing date itself triggers the contractual limitation on liability. Unless the parties agree to a survival clause—extending the representations and warranties past the closing date—the breaching party cannot be sued for damages post-closing for their later discovered breach. With that premise in mind, [the defendant] reasonably argues that the one-year limitation in the Survival Clause was intended to serve as a contractual time limit on any action brought based on a breach of the contract's representations and warranties. Under [the defendant's] theory, [the plaintiff] could not bring a claim without the Survival Clause, and, even with the Survival Clause, [the plaintiff] only had one year after closing to bring such a claim.
>
> This interpretation has some basis in out-of-circuit case law. In *State Street Bank & Trust Co. v. Denman Tire Corp.*, 240 F.3d 83 (1st Cir. 2001), the First

Circuit held that a clause stating that the representations and warranties "shall expire on the second (2nd) anniversary of the Closing" clearly described a contractual statute of limitation. *Id.* at 87–88. The court reasoned that "[t]o say that something 'shall survive' for a period of time, . . . is very much like saying something 'shall expire' *after* a period of time." *Id.* at 88. And, although the clause did not include any language stating that a claim must be *filed* within the limitation period, "the language was reasonably susceptible to only one meaning: that any claim based on warranties contained in the Purchase Agreement must be brought within [the specified time period] of the closing." *Id.* (alterations in original) (internal quotation marks omitted); *see also Latek v. LeaseAmerica Corp.*, No. 90 C 7230, 1992 WL 170546, at *3 (N.D.Ill. July 16, 1992), *aff'd,* 7 F.3d 238 (7th Cir. Sept. 22, 1993) (stating that a provision that warranties "shall survive" for 18 months from the closing date "clearly describes a contractual statute of limitations"); *Commonwealth Fin. Corp. v. USAmeribancs, Inc.*, No. 86 C 6181, 1987 WL 19142, at *2 (N.D.Ill. Oct. 20, 1987) (concluding that a cause of action was time-barred when the provision authorizing suit stated that the seller shall indemnify buyer for one year after closing).

*Id.* at 952-53 (footnotes omitted). Thus, a survival clause can operate as a contractual statute of limitations that mandates the timely filing of a claim or claims prior to the expiration of the representation or warranty.

The particular survival clause at issue in *Western Filter* did not foreclose the assertion of the claims involved because the applicable state law disfavored such a provision and "suggested that language limiting the life of a warranty is not sufficiently clear and explicit to also limit the statute of limitation." *Id.* at 953. Thus, the Ninth Circuit concluded that the survival clause before it was ambiguous and could also be read to suggest "that the [clause's] one-year limitation serves only to specify when a breach of the representations and warranties may occur, but not when an action must be filed." *Id.*

Such reasoning is similar to the Sixth Circuit's analysis in *Arcade Co. Ltd. v. Arcade, LLC*, 105 F. App'x 808 (6th Cir. 2004). In that case, the court of appeals addressed the effect of a survival clause that provided that "[t]he representations, warranties, obligations, covenants,

agreements, undertakings and indemnifications of the parties contained herein and in any
instrument acquired to be delivered pursuant hereto shall survive the Closing for a period of one
(1) year." *Id.* at 810.

Ohio law governed that survival clause, just as Ohio law governs the effect of § 8.04(b)
here.  Thus, the Sixth Circuit began by recognizing that "Ohio law permits contractual
modification of the applicable statute of limitations if the modification is reasonable." *Id.*  The
court of appeals therefore explained that "[t]he question we must answer is not whether a
contractual modification of the applicable statute of limitations is valid but whether this
particular contract provides for one." *Id.*  And the Sixth Circuit answered the question as
follows:

> [T]he plain language of the [survival clause] provision neither mentions nor purports
> to limit any "action," "lawsuit," or "demand."  Rather, the provision explicitly states
> that the "representations, warranties, obligations, covenants, agreements,
> undertakings and indemnifications of the parties . . . shall survive the closing."  We
> conclude that under Ohio's case law, something more than this language is required
> to support a finding that the parties intended to modify the statute of limitations.

*Id.*  In reaching this conclusion, the court of appeals surveyed Ohio case law and determined that
the inclusion of specific language limiting the time within which to bring lawsuits or claims
made the parties' intent express and was permitted under Ohio law.  Rejecting an inference that
would read the *Arcade Co.* survival clause to have the same effect despite its lacking specific
language, the Sixth Circuit concluded:

> Statutes of limitation exist to provide finality for potential litigants.  This finality is
> achieved by extinguishing-after a statutorily prescribed period of time-potentially
> valid claims.  An agreement purporting to affect this finality must be made manifest
> in clear, unequivocal language.  A survival clause such as the one at issue here,
> which contains no express reference to "actions," "demands," or even to breach of
> the contract, does not clearly manifest an intent to establish a contractual limitations
> period.

*Id.* at 811. This at first blush would appear to dispose of the argument that Escue failed to file his claims in time, in a manner adverse to Defendants.

What distinguishes the instant case from *Arcade Co.* is that all of the parties involved here *agree* that they meant § 8.04(b) to extinguish claims after the two-year period provided by the contract. Defendants seek the dismissal of Escue's first two claims on the grounds that he failed to file them by January 1, 2009. Escue in turn seeks to dismiss Sequent's first counterclaim on the grounds that the company failed to assert the counterclaim within the two-year period (which the Court will discuss later). The parties disagree only on whether notice preserves the right to a claim or whether filing is needed. No party contends that § 8.04 does not preclude claims; the dispute is only in the details of whether a party can work around the deadline and file a claim later.

Therefore, in contrast to *Arcade Co.*, there is no real inference of intent necessary here to accept the contractual language as a limitation. Rather, there is a simple recognition of what the parties agree they meant to express. But for the parties' agreement, § 8.04 would have the same effect here as the survival clause in *Arcade Co.*

Escue argues that, even if the merger agreement required him to sue instead of sending his vague letter before January 1, 2009, Defendants have waived the defense. He notes that they failed to assert the § 8.04 argument in the 2009 negotiations between the parties and that Defendants failed to rely on the argument in their prior motion to dismiss briefing. Escue has failed to present this Court with any case law for the dubious proposition that a party has to rely upon any available defense it may have in negotiations or lose that defense. Additionally, Escue has failed to present this Court with any authority for the proposition that the non-appearance of

the defense in a Rule 12 motion resulted in waiver. The defense does not fall within the specific defenses subject to such waiver under Federal Rule of Civil Procedure 12(h)(1), and Defendants' Third Defense in their amended answer captures the defense. (ECF No. 176 ¶ 176.) There has been no waiver.

In light of the foregoing, this Court gives effect to the intended and agreed-upon, if perhaps less than optimally expressed in the contract, effect of § 8.04. Additionally, the possible defense that there has been a waiver of invoking this section to preclude Escue's claims fails. The Court then answers the next obvious question by recognizing that Escue's December 18, 2008 letter failed to extend the time limit for the representations and warranties he asserts Defendants violated.

It is one thing to accept the parties' representations as to what effect they intended the language of § 8.04 to have. The parties' agreement as to the intended effect gives concrete meaning to otherwise arguably ambiguous language. It is quite another thing to read into the language that which is not even remotely there. In other words, accepting the survival clause as being intended to terminate claims is reasonable here given that the clause's language could carry that agreed-upon effect. To ignore the parties due to lack of magic words in the clause would be improper under these specific circumstances. But construing § 8.04 to speak in any way to the notice issue would be unreasonably imputing to the clause a topic upon which it does not even arguably touch.

Section 8.04(b) does not include any express language stating that any such claims had to be filed within the two-year limitation period, but given the agreed-upon intent of the survival clause and the Sixth's Circuit's recognition that Ohio imposes an obligation to be specific on

14

survival clauses, the reasoning necessarily follows. Just as a party cannot evade a statutory statute of limitations simply by providing notice, so too Escue cannot evade the contractual limitations period by providing notice in the absence of a contractual provision permitting him to do so. Any claim based on representations or warranties contained in the merger agreement must be brought before the Court within two years of the closing. An interpretation that enables a vague notice of unidentified claims such as that found here to preserve the right to file would merely serve to read out the time component of the survival clause and enable one party to circumvent that which it agreed to contractually. If the parties intended for one another to have such a right of notice, they could and should have written it into their agreement.

Because the representation and warranties therefore expired on January 1, 2009, and because Escue did not assert his first two claims until September 2, 2009, only Defendants are entitled to summary judgment on Escue's first two claims.

### 2. Escue's Third and Fourth Claims

Escue seeks rescission of the merger agreement on the grounds of common law fraudulent inducement in his third claim, and in his fourth claim, Escue alternatively seeks monetary damages for fraudulent inducement. Under Ohio law, "[a] classic claim of fraudulent inducement asserts that a misrepresentation of facts outside the contract or other wrongful conduct induced a party to enter into the contract." *ABM Farms, Inc. v. Woods*, 81 Ohio St.3d 498, 503, 692 N.E.2d 574, 578 (1998). In his summary judgment briefing, Escue recasts his third and fourth claims more broadly, directing this Court to the elements of a general claim of fraud:

> (1) a representation (or concealment of a fact when there is a duty to disclose); (2) that is material to the transaction at hand; (3) made falsely, with knowledge of its

falsity or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with intent to mislead another into relying upon it; (5) justifiable reliance; and (6) resulting injury proximately caused by the reliance.

*Dunlop v. Ohio Dep't of Job & Family Servs.*, No. 11AP-929, 2012 WL 1078778, at *5 (10th

App. Dist.  Mar. 29, 2012) (treating fraudulent inducement claim as a broader fraud claim).  This

Court agrees with Defendants that they are entitled to summary judgment on both claims.

   The purported fraud that Escue targets is essentially the conduct at the heart of his

contract claims recast as tort claims.  Ohio law provides that "[a] tort claim based upon the same

actions as those upon which a claim of contract breach is based will exist independently of the

contract action only if the breaching party also breaches a duty owed separately from that created

by the contract, that is, a duty owed even if no contract existed."  *Textron Fin. Corp. v.*

*Nationwide Mut. Ins. Co.*, 115 Ohio App.3d 137, 151, 684 N.E.2d 1261, 1270 (9th App. Dist.

1996) (citing *Battista v. Lebanon Trotting Assoc.*, 538 F.2d 111, 117 (1976)).  It is therefore

questionable whether Ohio law permits the claims Escue asserts here.

   Assuming *arguendo* that Escue can establish the separate duty so as to proceed in tort, his

fraud claims suffer from a flawed foundation.  Originally, Escue asserted that he had never been

informed of the DOL criminal investigation and that he had learned of the investigation at a post-

merger Sequent meeting.  His testimony that he could not recall an alleged email and subsequent

phone conversation with Hutter regarding the DOL investigation is ultimately of little import in

this regard and does not provide a genuine issue of material fact, however, given that Sequent

unquestionably disclosed the investigation in a letter turned over as part of the due diligence

exchange.  This May 2006 letter also describes the reversed transaction involving the transferral

of funds from the Trust and its status as a potential ERISA violation.  Escue downplays the letter

and cites the lack of the investigation in the audited financial statement, but even his own expert testified that given the greater materiality standard for those statements, no one would rely solely on the statements in performing due diligence.  In other words, the letter disclosure was key.

The letter cannot be regarded as insufficient because Escue and his merger team testified that if they had read the letter, it would have been enough to halt the merger process.  Even if there was a misrepresentation or omission arising from the sufficiency of the content of the letter, however, Escue cannot be said to have relied on the misrepresentation or omission.  Sequent's disclosure cannot be held to have harmed Escue as a matter of both logic and law because Escue simply cannot be regarded as having relied on something that he did not know existed.  Sequent turned over a letter disclosing the DOL investigation.  Neither Escue nor any member of his merger team read that letter.  Thus, the letter did not mislead Escue into anything.

Although Escue complains that the letter was just part of four boxes worth of documents turned over to him, the manner of disclosure does not salvage his claims here.  Sequent did what it was obligated to do, and there is even an argument that its placing the letter behind a tab for "Litigation" for Escue erodes his "but they made it a needle in a haystack" argument.  The letter was also part of the electronic disk disclosure that followed the paper disclosures.

Escue and every member of his merger team acknowledged during this litigation that they received the May 2006 letter.  None of them asked for additional information on the DOL investigation of the reversed transaction.  The disclosure statement attached to the merger agreement also referenced the investigation, and no one on Escue's team commented on it.  The merger closed on January 1, 2007, Sequent settled the civil aspect with the DOL in September 2008, and the criminal aspect concluded without charges.  But Escue now asserts that Sequent

fraudulently hid the investigation and its circumstances so as to induce him into the merger.

This contention is flawed. Sequent did not conceal the investigation, even if the investigation did not appear on the audited financial statements. Although Escue's expert faults the 2006 statement for failing to disclose the investigation, she would accept the disclosure that appeared in the 2007 statement–a statement that did not disclose the criminal component of the DOL investigation. There is also no evidence the company concealed practices it knew to be illegal. Although some of the activities Escue asserts are illegal are unquestionably curious, this does not mean they are necessarily illegal. Escue's contentions of illegal dealing by Defendants is based on his own assertions; in his briefing, he does not "show his work" to raise a genuine issue of material fact in regard to the proposition.

There is no fraud here because Sequent did not conceal that which Escue targets, the fact of the investigation and the reversed transaction. Sequent disclosed both, and although Escue asserts the disclosure letter was misleading, he cannot attack its contents as a fraud that led him into the merger. Logic dictates that a party cannot ignore what is given to him and then complain that the contents of that which he ignored misled him. Accordingly, Escue is not entitled to partial summary judgment on these claims, and Defendants are entitled to summary judgment.

### 3. Escue's Fifth and Sixth Claims

Escue asserts fraud claims in his fifth and sixth claims for relief under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5(b), seeking the remedy of rescission of the merger agreement, or, in the alternative, monetary damages. In addition to other arguments, Defendants argue that the same rationale that

proved dispositive of Escue's prior two fraud claims. This Court agrees.

The Sixth Circuit had explained that "[t]o prevail on a securities fraud claim under § 10(b)(5) and Rule 10b–5, "a plaintiff must establish (1) a misrepresentation or omission, (2) of a material fact, (3) made with scienter, (4) justifiably relied on by plaintiffs, and (5) proximately causing them injury." *Saxe v. Dlusky*, 268 F. App'x 438, 440 (6th Cir. 2008) (citing *Helwig v. Vencor, Inc.,* 251 F.3d 540, 554 (6th Cir. 2001) (en banc)). Based on the reasoning set forth in Section II(B)(3) above, there is no misrepresentation or omission here to serve as the predicate fraud, and even if there were, there was absolutely no reliance. Defendants are entitled to summary judgment on Escue's fifth and sixth claims.

### 4. Escue's Seventh Claim

In his seventh claim, Escue asserts a claim against Hutter and the other individual defendants under Ohio Rev. Code §1701.93(A)(1) for damages proximately caused by their misrepresentations and omissions. The reasoning set forth in Section II(B)(3) above explains why there is no misrepresentation or omission here. Defendants are therefore also entitled to summary judgment on Escue's seventh claim.

### 5. Escue's Eighth Claim

At the outset, the Court notes that the parties, especially Escue, have briefed this claim is such a nearly Spartan manner that they appear to be mainly arguing by inference, relying on this Court to deduce what they mean and to find the evidence supporting their less than fully realized contentions. This is a curious approach to litigating Defendants' motion. Such a troubling approach pervades select portions of all the briefing, but perhaps nowhere as prevalent as in connection to Escue's eighth claim.

19

In this claim, Escue asserts a claim for breach of fiduciary duty against Hutter and the other individual defendants. He posits that the individual defendants owe a fiduciary duty to Sequent and its shareholders. Escue also contends that as the administrator of the benefit plans using the Trust, Sequent owes a fiduciary duty to the plans' participants and beneficiaries. By tiering and collecting rates above the actual insurance costs and reasonable expenses of administration, Escue argues, Defendants have misappropriated plan assets and breaches these duties. Finally, Escue asserts that because the individual defendants failed to disclose to him the full details surrounding the payment of $233,000 of Sequent funds to the DOL to settle the civil investigation (thereby negating and potential personal liability for the other directors), he was induced into voting for the expenditure.

Defendants argue that Escue is impermissibly attempting to obtain damages that would go to Sequent, not himself. They assert that given that he has failed to sustain distinct damages separate from those allegedly suffered by the corporation and all its shareholders, Escue cannot bring the claim outside of a shareholder derivative action. Additionally, Defendants contend that Escue has failed to explain both what efforts he made to obtain the action he seeks from the individual directors and his failure to make a pre-suit demand, which they contend are necessary in any shareholder derivative action under Federal Rule of Civil Procedure 23.1 and its Ohio counterpart. *See Davis v. DCB Fin. Corp.*, 259 F. Supp. 2d 664, 669-70 (S.D. Ohio 2003).

In response, Escue argues that he "has been separately and distinctly harmed from an injury to the corporation." (ECF No. 155, at 32.) He then proceeds to cite his support of the $233,000 payment and the up-charges for benefits as an employee and as a former employee receiving COBRA benefits as personal harm that sets him apart from Defendants' theory for

summary judgment. Finally, Escue complains that the fact that he was not fully informed before voting delayed his learning about the basis for his merger agreement claims under the survival clause in that agreement had nearly expired.

To the extent that Escue's eighth claim seeks in any way to pursue damages that are not separate and distinct from any injury to Sequent, the individual defendants are entitled to judgment. Another judicial officer in this District has accurately explained the rationale:

> Corporations and their officers and directors occupy a fiduciary relationship with corporate shareholders. *See Thomas v. Matthews,* 94 Ohio St. 32, 113 N.E. 669 (1916); *Thompson v. Central Ohio Cellular, Inc.,* 93 Ohio App.3d 530, 540, 639 N.E.2d 462 (1994). However, actions for breach of fiduciary duties are generally brought in derivative suits. *Owens,* 86 Ohio App.3d at 220, 620 N.E.2d 234. This is because the right to maintain an action to recover for the alleged negligence, fraud, or misconduct of directors and officers, resulting in the depletion of the corporation property, belongs to the corporation itself. *Id.* A complaining shareholder has a direct action only if he is injured in a way that is separate and distinct from an injury to the corporation. *Weston,* 74 Ohio St.3d at 379, 658 N.E.2d 1058.

*Davis,* 259 F. Supp. 2d at 673. Defendants are therefore correct that Escue can only rely on a distinct injury personal to him.

The Court does not accept as distinct personal harm Escue's contention that he was delayed until the survival clause has almost expired in finding out about the basis for his Merger Agreement claims. This Court does not see how this constitutes harm given that at worst, Escue did discover the claims in time and then only failed to assert them properly (*i.e.*, by filing) because he did not understand the agreement he had negotiated and signed. That misunderstanding neither arises from the circumstances surrounding the $233,000 nor can be attributed to the fact of the payment having been made.

This leaves as potential sufficient damages the nebulous harm Escue insists he incurred by voting in favor of the $233,000 payment and the purported upcharges he paid for benefits

during and after his employment.  Neither component of Escue's argument salvages his claim.

First, the payment of the $233,000, if improper, is a harm that flows to Sequent and its shareholders generally, not distinctly to Escue.  A shareholder derivative action is the proper avenue for any potential relief.

Second, Escue's election to hide the law and relevant facts from the opposing parties and this Court means that he has failed to present the genuine issue of material facts he posits arises from the asserted upcharging.  Nowhere in the briefing on his eighth claim does Escue direct this Court to the elements of his claim.  Nowehere does he connect the evidence to those elements, And nowhere does he note the law that would support his contention that upcharging is improper so as to be cognizable as a breach of fiduciary duty.  Instead, Escue's states in an affidavit: "It is my understanding that a business, like Sequent, may charge an administrative fee, or may up-charge insurance premiums to cover the expenses of administering a Plan that includes those insurance benefits."  (ECF No. 155-2, Escue Aff. ¶ 22.)  The time to share the basis for that understanding beyond simply noting in his deposition that his counsel had informed him that the practice is improper was during summary judgment briefing.  It is not this Court's proper role to assemble a party's case for that party.

Defendants are also entitled to summary judgment on Escue's eighth claim.

### 6. Escue's Ninth and Tenth Claims

Escue asserts two additional fraud claims in his ninth and tenth claims, which he brings against Sequent, Hutter, and the other individual defendants for the purported unlawful sale of a security under Ohio Revised Code §§ 1707.43 and 1707.44.  Escue seeks rescission of the merger agreement or, in the alternative, damages.

It is well settled that §§ 1707.44(B)(4) and 1707.44(J) prohibit only an affirmative misrepresentation. Neither statutory provision applies to a fraudulent nondisclosure or an omission of material facts. *State v. Warner*, 55 Ohio St.3d 31, 38, 564 N.E.2d 18, 52 (1990). Escue argues that misrepresentations occurred, but as explained in Section II(B)(3) above, there has been no fraudulent nondisclosure here, much less an affirmative misrepresentation. Defendants are entitled to summary judgment on Escue's ninth and tenth claims.

### 7. Escue's Eleventh Claim

In his eleventh claim, Escue alleges that Sequent breached his employment agreement with Sequent by failing to compensate him under the terms of the agreement. Specifically, he contends that Sequent failed to pay his full base salary for 2008 and 2009, failed to pay the correct 491(k) retirement plan matching amount for 2008 and 2009, and failed to fund fully his portion of the Sequent non-qualified deferred compensation plan. Escue also asserts that Sequent has refused to provide him with a car allowance or lease for 2007, 2008, and 2009, despite doing so for other employees.

Sequent moves for summary judgment on this breach of contract claim, arguing that "Escue received that to which he was entitled under his employment agreement." (ECF No. 146, at 36.) This statement, contained in the memorandum in support of Sequent's motion, is incorrect based on the contentions Sequent then makes forty-two days later in its reply memorandum.

In the reply memorandum, Sequent takes Escue to task for "[h]olding Sequent to the letter of his employment agreement." (ECF No. 168, at 34.) Sequent then soon concedes that it fell short of meeting its 2009 contribution to Escue's 401(k) by four cents and that it fell short of

its 2008 contribution by $972.39 (using Sequent's amounts). This alone precludes summary judgment for Sequent on this aspect of Escue's claim and punctures the company's "Escue received everything" argument.

The remaining portions of Escue's eleventh claim are also inappropriate for summary judgment in light of various disputed facts. Sequent has produced an affidavit and documentation that suggests that it paid Escue what he was due, but he rejects such a contention in his affidavit and in fact states that he received no funds for select areas in years when Sequent states it paid him. The calculations used to determine the appropriate sums due Escue, if any, are in dispute, as well as whether Sequent properly applied compensation for his time on forced leave following the filing of this lawsuit against what they owed him. Additionally, Escue contends that a change Sequent made in how it calculated and applied overhead costs worked to unilaterally change the terms of his employment agreement, and this Court's review of the agreement does not reveal a provision addressing this point; it is unclear whether any restriction existed on such action by Sequent. It is also unclear what precise role a loan from Sequent to Escue actually played in their financial dealings and whether, as it contends, Sequent is due or even can now claim and offset related to that loan.

Equally unclear is whether Escue's position encompasses contributions that would have occurred but for the 2008 termination of the nonqualified deferred compensation plan. It appears to this Court that Escue is targeting such contributions, but that must be this Court's flawed reading of the briefing, because it also appears that Escue voted to terminate this plan. The Court will address this matter at the final pretrial conference. Certainly, Escue cannot complain about failing to receive that which he voted to stop receiving.

Finally, there also exists a genuine dispute of material facts surrounding the car-related component of his claim. Sequent has produced an affidavit in which Sequent CFO Caldwell states that Escue was able to direct the Birmingham staff to provide him with a car allowance, but that Escue never did, and when the payroll and benefits functions were transferred to the Columbus office, the Ohio staff simply followed the lack of allowance. (ECF No. 146-5, Caldwell Aff. ¶ 14.) In Escue's affidavit, however, he states that he requested the car benefit. (ECF No. 155-2, Escue Aff. ¶ 37.)

### 8. Escue's Twelfth Claim

Escue requests declaratory judgment in his twelfth claim, asserting that the non-competition and non-solicitation provisions of his employment agreement, some of which extend for twenty-four months, are void and unenforceable. Addressing this claim in the summary judgment briefing, Defendants state that "[t]he relief sought in th[is] final claim is moot since over twenty-four (24) months will have passed by the time this motion is decided." (ECF No. 146, at 36.) In response, Escue states in his briefing that "Defendants' stipulation that Claim 12 is moot indicates that Defendants will not attempt to enforce the provisions referenced in that Claim." (ECF No. 155, at 6.)

These statements are of little assistance to this Court in disposing of a claim that apparently no party sees a need to pursue. Although this Court suspects that the intent of Defendants' statement is to indicate that the non-competition and non-solicitation provisions of Escue's employment agreement are a non-issue–meaning that not only have they expired, but there is also no interest in pursing any possible breach of the provisions while they were in effect–the Court cannot *sua sponte* dismiss a claim based upon drawing a possibly incorrect

inference read into a declaration of "mootness" in a statement made in briefing.  There is a difference between restrictive provisions that have expired and restrictive provisions that were void and unenforceable from the outset.  Additionally, Escue's characterization of Defendants' statement is not precisely correct, even if it is a probable inference.  In any event, no party has moved for summary judgment on Claim Twelve, which means that the claim remains pending.

### 9. Sequent's First Counterclaim

In its first counterclaim, Sequent asserts a claim for damages for breach of the merger agreement based upon the 2001-2007 receipt of commissions by Escue and BBSA that the DOL determined were in violation of ERISA.  Sequent alleges that as a result of Escue's conduct, it incurred attorney fees and costs and had to pay as reimbursement a total amount of $64,395 to BBSA Benefit Plan participants.  The DOL compliance review related to the commissions took place after the effective date of the merger, but addressed actions that occurred prior to the merger.

Escue seeks summary judgment on this counterclaim on the ground the claim is time-barred.  He also asserts an alternative ground that this Court need not reach given the dispositive nature of this first argument.  To support that argument, Escue explains that his alleged breach of the merger agreement can only relate to representations or warranties he made concerning BBSA in the actual merger agreement and that the merger agreement itself consequently bars the claim.

Escue directs this Court to § 8.04 of the merger agreement, which as this Court noted earlier is titled "Survival of Representations and Warranties; Indemnification" and provides in relevant part that his representations "shall survive the execution and delivery of this Agreement

and the Closing until the earlier of an initial public offering of Sequent's Common Stock or the second anniversary date of the Closing."  (ECF No. 147-56, at 38.)  The section as a whole provides that some written representations among the parties shall never expire, some representations shall expire after seven years after the merger closes, and some shall expire two years after the merger closes.  Of relevance here is the last category, quoted above, and its anniversary date provision.  Based on the closing date, § 8.04 bars non-exempted claims asserted after the second anniversary date of January 1, 2009.  Because Sequent first asserted the purported breach by Escue on December 18, 2009, Escue posits, the company's first counterclaim is time-barred.

In its memorandum in response, Sequent relies on the legal axiom that "[w]hat is 'sauce for the goose, is sauce for the gander.' "[4] (ECF No. 183, at 6.)  Sequent repeats its position that it recognizes January 1, 2009, as the critical date for every single claim in this action for breach of the merger agreement based on a written representation.  The company again explains its position that Escue cannot evade the preclusive effect of § 8.04 on his own claims by a unilateral notice while concurrently using the same section to dispose of the first counterclaim.  Sequent also notes that it had previously indicated that if this Court granted summary judgment in the

_____

[4] This saying upon which many attorneys rely without apparent hesitation (often in discovery disputes), also described as an aphorism, appears in enough decisions to reach the status of an axiom.  *See, e.g., U.S. v. Mitchell*, 429 F. App'x 271, 275 (4th Cir. 2011); *Perkins v. McKee*, 411 F. App'x 822, 831 (6th Cir. 2011); *In re Aurora Dairy Corp. Organic Milk Mkt. & Sales Practices Litig.*, 621 F.3d 781, 791 (8th Cir. 2010); *SCO Group, Inc. v. Novell, Inc.*, 578 F.3d 1201, 1227 (10th Cir. 2009); *Martinez-Serrano v. Quality Health Servs. of Puerto Rico, Inc.*, 568 F.3d 278, 284 n.2 (1st Cir. 2009); *Aurora Loan Servs., Inc. v. Caddieth*, 442 F.3d 1018, 1028 (7th Cir. 2006); *U.S. v. Doherty*, 786 F.2d 491, 500 (2d Cir. 1986); *Mercer v. C.A. Roberts Co.*, 570 F.2d 1232, 1239 (5th Cir. 1978).  In contrast to invocation of the saying in many if not most discovery disputes, the saying actually applies here.

company's favor on Escue's first claim for breach of the merger agreement, then Sequent would dismiss the first counterclaim. One line in a response memorandum does not effectuate a contingent dismissal.

Section 8.04 required Sequent to bring its claim prior to January 1, 2009. The company failed to do so. Accordingly, Escue is entitled to summary judgment on the first counterclaim.

### 10. Sequent's Second Counterclaim

Sequent's second counterclaim alleges that Escue breached a fiduciary duty to the company in his management of Sequent's Birmingham, Alabama office. The parties agree on the elements involved in this claim:

> In order to recover for a breach of fiduciary duty, the plaintiff must show the existence of a duty on the part of the alleged wrongdoer not to subject the corporation to the injury complained of, a failure to observe such duty, and an injury proximately resulting therefrom.

*Davis v. DCB Fin. Corp.*, 259 F. Supp. 2d at 673 (citing *McConnell v. Hunt Sports Enters.*, 132 Ohio App.3d 657, 687, 725 N.E.2d 1193, 1215 (1999)). Additionally, the parties agree on the duties involved, specifically those set forth in Ohio Revised Code § 1701.59(B), and the standard applied, set forth in Ohio Revised Code § 1701.59(C)(1). The particular circumstances to which this Court must apply the foregoing law are most easily discussed when broken into three basic contentions.

The company first argues that Escue engaged in self-dealing. The lease that BBSA had for its Birmingham office space expired in September 2008. At a Sequent board meeting, Escue purportedly informed the board that he had executed a sub-lease with Optimal Reading Services Group, Inc. ("Optimal"), which itself was leasing the space from the City of Homewood. Sequent claims that Escue failed to disclose that he either owned or had an equity interest in

Optimal, thereby breaching his fiduciary duty to Sequent. According to Sequent CFO Caldwell, the new lease was much more expensive than the lease Escue had held. (ECF No. 146-5, Caldwell Aff. ¶ 16.) He also asserts that "[t]his new lease was negotiated by Mr. Escue." (*Id.*)

Escue in turn directs this Court to evidence that indicates that in addition to his involvement in the sub-lease negotiations, Defendant Kerber and Sequent's in-house and outside counsel were involved. (ECF No. 147-61.) Escue also notes that he disclosed his small ownership role in Optimal when asked. Escue then finally focuses on the key area related to this aspect of the counterclaim, arguing that

> Sequent cannot point to any injury by way of Escue's alleged actions. Sequent has not provided any evidence of being tied to a sub-lease that was priced above the local market for similar class and location space as of the execution of the sub-lease in October 2008. Sequent similarly cannot point to any direct monetary benefit to Escue, to the detriment of Sequent, by Sequent's execution of the sub-lease.

(ECF No. 157, at 40.)

It perhaps does not matter as much who knew what when or who aside from Escue participated in the negotiations if the negotiations did not result in a sub-lease that was not in Sequent's interests. But Hutter states in an affidavit that "Sequent did not pay a proportionate share of the rent," suggesting that the company indeed incurred harm. ((ECF No. 153-3, Supp. Hutter Decl. ¶ 9.) Hutter also states that if Sequent had known of the potential conflict of interest, the company "would not have allowed [Escue] to participate in the negotiations." (*Id.*) Escue attempts to counter these points by pointing out that, given his greater interest in Sequent than Optimal, "[a]ny 'gain' by Optimal would disproportionately harm Escue through his ownership of Sequent stock." (ECF No. 170, at 4.) There is at least an at-first-blush, superficial appeal to this reasoning, but there is also a genuine issue of material fact as to the circumstances

surrounding the sub-lease and whether Sequent sustained injury from Escue's conduct. The proper focus is not on whether Escue actually made a smart move, but on whether he failed to work in Sequent's interests.

Sequent next claims that Escue breached his fiduciary duty "by refusing to implement Sequent polices and procedures, countermanding directives from senior management, and not devoting full time to his duties as regional manager." (ECF No. 176 ¶ 205.) In arguing for summary judgment on this aspect of Sequent's counterclaim, Escue asserts that the company cannot show that he failed to observe his duties. To support this contention, Escue directs this Court to Hutter's deposition testimony, which Escue summarizes as follows: "Defendant William Hutter, Chief Executive Officer of Sequent and to whom Mr. Escue reported while employed at Sequent, testified that 'Mr. Escue did not violate his employment' in any way." (ECF No. 157, at 41.)

Escue's brief leaves out the full exchange that took place at the deposition:

Q. Did Mr. -- other than for what you've just described -- strike that. Did Mr. Escue violate his employment in any way?

**A. Mr. Escue did not violate his employment, but he violated -- he certainly violated the -- the spirit and intent of a cooperative working relationship, which is necessary at the executive level.**

(ECF No.160, at 60 (Hutter Dep. at 235).) When asked later about the allegations comprising this aspect of the counterclaim, Hutter then explained:

Q. And what facts underlie those allegations?

**A. The fact that there was inconsistent communication with clients under Mr. Escue's purview. There was inadequate billing on a client-by-client basis, in which he favored his friends and family network. I was told by numerous people in the office that upon our departure from the environment, that Mr. Escue would come back in and say, don't pay any attention to that,**

**we're not going to do that.**

Q. And when you say that there was inadequate billing, what specifically are you talking about?

**A. The nature of the sophistication of offering and indemnification provisions that Sequent provides to client companies, including our ESAC performance surety bond, our certification institute, and the credibility of factors that we bring to the table cost a lot more money to deliver that level of service. And because of that, revenue needed to increase within the Birmingham market and the Nashville market.**

Q. And what role did Mr. Escue perform or not perform in that regard?

**A. He chose not to follow directives and implement the appropriate charges to cover those operating expenses.**

(*Id.* at 160 (Hutter Dep. at 244-45).) Even if Hutter could not provide at his deposition the precise numbers associated with the damage Sequent had purportedly sustained–he stated they had not quantified it yet[5]–the foregoing extended testimony places the testimony fragment upon which Escue relies into context and presents a genuine issue of material fact precluding summary judgment for Escue.

Sequent also claims that Escue revealed attorney-client privileged communications in the amended complaint and otherwise in order to further his own business interests. Correctly noting that the issue of whether the complaint itself can serve as the basis for a counterclaim, Escue seeks summary judgment on the otherwise-disclosed communication aspect on the

---

[5] The Court notes that Hutter's statement might appear to be curious because he also states in his January 3, 2012 Supplemental Declaration that prior to the lawsuit, "an analysis reflected that Mr. Escue's friends received preferential economic terms because of his reluctance to implement Sequent's policies. This analysis was in discovery." (ECF No. 153-3, Supp. Hutter Decl. ¶ 8.) The Court assigns no conflict to the declaration and deposition testimony; it appears an analysis was prepared and disclosed during discovery, but as of the time of the deposition, the analysis had not resulted in a quantified number of precise amount of the claimed injury Sequent allegedly has sustained.

grounds that Sequent has failed to identify the conduct complained of and how it benefitted Escue.

In response, Sequent explains that it has inferred that Escue told Craig Parker, then the CEO of Optimal, information protected by the attorney-client privilege. Parker was secretly representing Escue against Sequent. The company then asserts that Parker pretended to be outraged about the contents of Escue's pleading, told people in the Birmingham community, including Sequent customers, that Sequent was engaging in illegal practices, and caused Optimal to terminate its Sequent contract.

Parker's deposition testimony confirms an attorney-client relationship with Escue and recounts a Sequent open house in which Parker questioned Hutter about the circumstances surrounding Escue's conflict with the company. The deposition also indicates that Parker unsuccessfully sought written assurances from Sequent regarding its practices and the security of Optimal's business dealings with Sequent; Optimal was concerned about it potential exposure to its employees and whether any of its funds had been misappropriated. Additionally, Parker explains how he sent the complaint and his own email communications with Hutter to several friends who had companies that did business with Sequent and discussed the allegations of misconduct with these individuals.

Where Sequent's theory of the claim breaks down is attributing Optimal's decision to terminate its relationship with Sequent to Parker. Sequent's briefing argues that Parker caused Optimal to terminate its contract with Sequent. Parker testified that he did not know who made the decision to terminate Optimal's relationship with Sequent. (ECF No. 163, Parker Dep., at 110.) Optimal's Jeremy Sprinkle testified in his deposition that after meeting with Hutter, he

made the decision to terminate Sequent. (ECF No. 166-1, at 20 (Sprinkle Dep., at 77).) Review of both men's depositions indicates that Optimal replaced Sequent after repeatedly asking Sequent for clarification of its business practices and receiving what Optimal regarded as unsatisfactory answers.

Sequent's claim does not connect to the damages the company asserts it sustained. Parker apparently set the Optimal inquiry into motion, but others within Optimal made the ultimate decision that Sequent asserts as damages. Although Parker's role is curious, the loss of business that Sequent sustained was due to Sequent's dealings with Optimal, not to the allegations of illegal conduct by Sequent that Escue alleges. In other words, the mere allegations of misconduct did not cause the loss of business. Rather, the insufficiency of Sequent's response to inquiries caused the loss of business. Summary judgment for Escue is therefore warranted on this component of the second counterclaim.

### 11. Motion filed by Individual Shareholders (ECF No. 145)

Schoonover, Boyer, Gettman, Kerber, and Ewers also filed a joint motion for summary judgment filed that presents arguments on the ten claims Escue has asserted again them that are distinct from those arguments discussed above. (ECF No. 145.) Because these defendants are already entitled to summary judgment based on those arguments set forth in their other summary judgment motion filed in conjunction with Sequent and Hutter (ECF No. 146), the Court notes that their alternative arguments and additional motion for summary judgment (ECF No. 145) are moot.

### III. Conclusion

As set forth herein, the Court **GRANTS IN PART** and **DENIES IN PART** the motion for summary judgment filed by Sequent, Inc., Hutter, Schoonover, Boyer, Gettman, Kerber, and Ewers (ECF No. 146), **GRANTS IN PART** and **DENIES IN PART** the motion for summary judgment filed by Escue (ECF No. 157), and **GRANTS** the supplemental motion for summary judgment filed by Escue (ECF No. 182). The motion for summary judgment filed by Schoonover, Boyer, Gettman, Kerber, and Ewers is **MOOT**. (ECF No. 145.)

Defendants are entitled to summary judgment on Escue's first, second, third, fourth, fifth, sixth, seventh, eighth, ninth, and tenth claims. Escue is entitled to summary judgment on Sequent's first counterclaim and the communications component of Sequent's second counterclaim. Escue's eleventh and twelfth claims remain pending, as does the self-dealing and policies-and-procedures components of Sequent's second counterclaim.

**IT IS SO ORDERED**.

_____/s/ Gregory L. Frost_____
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE